Catherine J. CARAPELLUCCI, Administratrix of the Estate of Vincent J. Marquardo, Deceased, Plaintiff,

v.

TOWN OF WINCHESTER, et al., Defendants.

Civ. A. No. 85–4561–K.

United States District Court, D. Massachusetts.

Feb. 3, 1989.

Richard H. Wynn, Boston, Mass., for plaintiff.

Douglas A. Randall, Quincy, Mass., for all defendants.

Richard W. Renehan, Patrick J. Feeley, Hill and Barlow, Boston, Mass., for police defendants.

## MEMORANDUM AND ORDER

KEETON, District Judge.

This action arises from the death of Vincent J. Marquardo while he was in the custody of the Winchester Police Department. The plaintiff, administratrix of Marquardo's estate, is suing the Town of Winchester, five of the Town's selectmen, the Chief of Police, and three Winchester police officers. Plaintiff alleges that the defendants caused the decedent's death by acting with deliberate indifference to Marquardo's serious medical need while he was in their custody. Marquardo died while in the Winchester jail as a result of having ingested, before he was arrested, alcohol, glutethimide, and seven times the therapeutic dosage of codeine. Plaintiff asserts claims under 42 U.S.C. § 1983, alleging that the policemen and Town officials, acting under color of state law, violated Marquardo's Fourth, Eighth and Fourteenth Amendment rights. She also asserts claims under Massachusetts state law.

Defendants now move for summary judgment on all claims that survived this court's December 1, 1986 ruling on defendants' motions to dismiss.

### I. Factual Background

Most of the available evidence regarding the last few hours of the decedent's life comes from defendants. According to affidavits and other evidence they have produced in support of their motions, at 9:40 p.m. on December 31, 1983 police officers Barry Donaghey and Jonathan Dean stopped Vincent Marquardo for failing to stop at a red light. After observing Marquardo, Officer Donaghey asked him to get out of the car and perform a heel-to-toe field sobriety test, which Marquardo failed. In addition, the officers observed that although Marquardo could stand by himself, his eyes appeared glassy and there was a strong odor of alcohol on his breath. A near-empty one-pint bottle of Peppermint Schnapps lay open in Marquardo's car.

The officers took Marquardo to the Winchester police station where Lt. Culhane informed Marquardo of his right to be examined by a physician. Marquardo declined. Lt. Culhane examined Marquardo and concluded he was not in need of medical attention. Marquardo consented to a breathalyzer exam and registered a blood alcohol content of .13% at 10:10 p.m.

When offered an opportunity to make bail, Marquardo declined, stating, "I don't want to call my father; he'll kill me. I just want to sleep." Lt. Culhane checked on Marquardo periodically. Marquardo appeared to be asleep and snoring from approximately 11:45 p.m. until 1:03 a.m. When Lt. Culhane checked on Marquardo at 1:40 a.m. he found that Marquardo was

no longer snoring nor apparently breathing. Lt. Culhane checked for breathing and pulse and could detect only a faint pulse. Several officers then commenced cardio-pulmonary resuscitation and summoned an ambulance, but neither the officers nor the staff at the Winchester Hospital Emergency Room were able to revive Marquardo. He was pronounced dead at 2:26 a.m.

According to Dr. Pappas, the medical examiner who performed the autopsy, Marquardo died of asphyxia due to aspiration of vomitus, in addition to the effects of lethal levels of codeine, exacerbated by glutethimide. Laboratory tests revealed that his blood contained codeine at seven times the upper limit of the known therapeutic range and in the range causing severe central nervous system depression. No alcohol was found in Marquardo's blood at the time of his death. According to Dr. Pappas, the symptoms of these drugs are indistinguishable from the symptoms of alcohol abuse.

Plaintiff does not dispute most of defendants' proffered evidence. Plaintiff, however, based on the affidavits and deposition testimony of witnesses who observed Marquardo on the night of his arrest, alleges that Marquardo's physical and mental condition was considerably worse than that described by the officers. Plaintiff also disputes that Marquardo could have registered .13% on the breathalyzer, given the lack of alcohol in Marquardo's blood four hours later at his death. Finally, she claims that the symptoms of the use of these drugs were not the same as that of alcohol use alone.

## II. The Standard of Protection For Pretrial Detainees

The Due Process Clause of the Fourteenth Amendment requires that government treatment of those in its custody not "shock the conscience" of contemporary society. *See Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952). Under this "substantive" Due Process standard pretrial detainees such as Victor Marquardo have protection against arbitrary and oppressive treatment while they are in government custody. *See Daniels v. Williams*, 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986); *City of Revere v. Massachusetts General Hospital*, 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77 L.Ed. 2d 605 (1983). Although the Supreme Court has not defined precisely the standard of conduct the Due Process Clause requires of custodians of detainees, Supreme Court opinions have established some outside limits within which this standard must fall.

First, detainees do not have a cause of action for harms arising from mere negligence. *See Davidson v. Cannon*, 474 U.S. 344, 348, 106 S.Ct. 668, 670, 88 L.Ed.2d 677 (1986); *Daniels v. Williams*, 474 U.S. 327, 333, 106 S.Ct. 662, 666, 88 L.Ed.2d 662 (1986). Second, detainees are entitled to at least as much protection as the Cruel and Unusual Punishment Clause of the Eighth Amendment affords to convicted criminals in prison. *See City of Revere v. Massachusetts General Hospital*, 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983). In addition, because detainees have not been convicted of any crime, the state may not impose any restriction for the purpose of punishment. *See Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Therefore, detainees are subject only to restrictions to which " 'an alternative purpose [other than punishment] ... may rationally be connected' " and which are not " 'excessive in relation to the alternative purpose assigned [to it].' " *Id.* at 538, 99 S.Ct. at 1873 (quoting *Kennedy v. Mendoza–Martinez*, 372 U.S. 144, 168–69, 83 S.Ct. 554, 567–68, 9 L.Ed.2d 644 (1963)).

The standard of protection owed to convicted criminals under the Eighth Amendment is that officers are liable if they exhibit "deliberate indifference" to the inmate's serious medical or other needs. *See Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976). This standard has been formulated in various ways, including "reckless disregard," *Martin v. White*, 742 F.2d 469, 474 (8th Cir. 1984), *Layne v. Vinzant*, 657 F.2d 468, 471 (1st Cir.1981), "wanton infliction of pain," *Estelle v. Gamble*, 429 U.S. at 104, 97 S.Ct.

at 291, and "gross negligence," *Kibbe v. City of Springfield,* 777 F.2d 801, 804 (1st Cir.1985), *cert. granted,* 475 U.S. 1064, 106 S.Ct. 1374, 89 L.Ed.2d 600 (1986), *motion granted,* 475 U.S. 1116, 106 S.Ct. 1631, 90 L.Ed.2d 177, *cert. dismissed,* 480 U.S. 257, 107 S.Ct. 1114, 94 L.Ed.2d 293 (1987). *Cf. Voutour v. Vitale,* 761 F.2d 812, 820 (1st Cir.1985), *cert. denied,* 474 U.S. 1100, 106 S.Ct. 879, 88 L.Ed.2d 916 (1986) ("gross negligence amounting to deliberate indifference"). These various formulations of the standard have conflicting nuances that remain unresolved at present. The First Circuit, however, has declared that in this circuit the deliberate indifference standard requires at least evidence sufficient to support an inference as to the subjective state of mind of the defendant. A plaintiff must prove "acts or omissions so dangerous (in respect to health or safety) that a defendant's 'knowledge of [a large] ... risk can be inferred.'" *Cortes–Quinones v. Jimenez–Nettleship,* 842 F.2d 556, 558 (1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 68, 102 L.Ed.2d 45 (1988) (quoting *Duckworth v. Franzen,* 780 F.2d 645, 652 (7th Cir. 1985), *cert. denied,* 479 U.S. 816, 107 S.Ct. 71, 93 L.Ed.2d 28 (1986)). *Cf. Sires v. Berman,* 834 F.2d 9 (1st Cir.1987) (noting that deliberate indifference concerns state of mind and that any deficiency in treatment must be intentional).

The standard of protection for pretrial detainees is at least as demanding as this deliberate indifference standard. *See City of Revere v. Massachusetts General Hospital,* 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983). Several courts have held that the standard for pretrial detainees is the same as the Eighth Amendment deliberate indifference standard, reasoning that there is no meaningful distinction between the Fourteenth Amendment test of rational relationship to a legitimate government purpose and the Eighth Amendment deliberate indifference standard. *See Hamm v. DeKalb County,* 774 F.2d 1567, 1574 (11th Cir.1985), *cert. denied,* 475 U.S. 1096, 106 S.Ct. 1492, 89 L.Ed.2d 894 (1986); *Robinson v. Moses,* 644 F.Supp. 975, 980–81 (N.D.Ind.1986) (following *Hamm* ). Other courts have held that the standard of

protection due to detainees under the Fourteenth Amendment demands more than does the Eighth Amendment standard, which requires only that the custodial officials refrain from cruel and unusual punishment. *See Cupit v. Jones,* 835 F.2d 82, 84 (5th Cir.1987); *Norris v. Frame,* 585 F.2d 1183, 1187 (3d Cir.1978); (*Lightbody v. Town of Hampton,* 618 F.Supp. 6, 11 (D.N.H.1984). In the context of the failure to provide medical care, recognition that pretrial detinees have the benefit of a more protective Fourteenth Amendment standard may mean that a detainee is not required to show an intentional or purposeful disregard for the detainee's need; a showing of gross negligence, as determined by an objective standard of conduct, may be sufficient to establish liability. *But cf. Thompson v. Olson,* 798 F.2d 552, 558 (1st Cir.1986), *cert. denied,* 480 U.S. 908, 107 S.Ct. 1354, 94 L.Ed.2d 524 (1987) (stressing the lack of maliciousness in finding that police conduct does not meet the shocks-the-conscience standard). Still, even under this standard a plaintiff must prove more than negligence.

I conclude that in the present case it is unnecessary to resolve debatable issues regarding the precise formulation of the applicable standard. As explained below, plaintiff has not presented evidence from which a reasonable juror could find, in the actions of the defendants in their care of Marquardo, even "gross negligence" objectively defined, which is the proof required of a plaintiff under the standard most favorable to the plaintiff among the various standards arguably consistent with precedents.

### III. Application of the Standard to Claims Against Individual Police Officers

▮ Despite extensive discovery and testimony of eye and expert witnesses, plaintiff has failed to produce evidence to show a genuine issue of fact as to whether Marquardo's need for medical attention was sufficiently obvious that it would have been at least gross negligence (if not worse) for the officers not to have recognized it.

Plaintiff offers no evidence that Marquardo exhibited any symptoms, while in the custody of the defendants, that were inconsistent with the hypothesis that he was under the influence of alcohol alone.

Plaintiff attempts to establish that the officers were or should have been alerted to Marquardo's serious medical needs by discrediting the testimony of the police officers that the evidence available to them indicated only that Marquardo was drunk. This attempt misses the mark, however, because the plaintiff cannot meet her burden of proof by merely discrediting evidence offered against her claim. She must, instead, proffer evidence that will support reasoned findings in support of the elements of her claim. That is, on either motion for directed verdict or motion for summary judgment, the burden of proof is not satisfied unless the party having it calls to the court's attention evidence from which a reasoned inference of the existence of each material fact can be drawn. Providing a basis upon which a factfinder might reasonably discredit a fact asserted by the opposing party does not alone supply a reasoned basis in evidence for a finding of the existence of the fact asserted by the party with the burden of proof. Instead, it leaves a void.

■ For example, plaintiff contends that the testimony of Dr. Sturner denying the possibility that Marquardo could have registered .13% on the breathalyzer at 10:10 p.m. when he had no alcohol in his blood at the time of his death (about three hours later) creates an issue of fact as to whether the officers should have known Marquardo was under the influence of drugs as well as alcohol. Even if a jury should find that the .13% reading was spurious, however, that does not constitute a basis for finding that the officers received, or should have received, a reading of .08% or less and that, absent gross negligence, such a reading would have alerted them to the fact that Marquardo's symptoms could not have been caused by alcohol alone. *Cf. Thompson v. Olson*, 798 F.2d 552, 558–59 (1st Cir.1986) (holding that the failure to recognize that a detainee was ill, rather than

drunk, even after the detainee informed the officer of his diabetic condition, was not more than negligence).

Furthermore, although Dr. Sturner testified that the symptoms of the drugs and alcohol may not be exactly the same in all cases, there is no evidence that Marquardo exhibited symptoms of drug ingestion in this case. Dr. Sturner named only one symptom of codeine (constricted pupils) that would not also be symptomatic of alcohol use. Pappas Aff. at 7. Plaintiff offers no evidence that Marquardo exhibited constricted pupils at the time of booking. According to Dr. Sturner, the codeine would have been absorbed approximately two to four hours after ingestion. Marquardo was arrested, booked and placed in his cell within one hour. In these circumstances there is an absence of evidence to support a reasoned inference that he exhibited symptoms of the effect of codeine during booking. Again, even though a factfinder may discredit defendants' evidence that he did not exhibit such symptoms, this does not supply a basis for a reasoned inference that he exhibited such symptoms.

In addition, even without the breathalyzer test the officers had ample basis to conclude that Marquardo was merely under the influence of alcohol. The officers' affidavits describe Marquardo at the time of arrest as able to get out of his car and stand on his feet, glassy-eyed, smelling of alcohol, "coherent" but with slurred speech and unable to perform the heel-to-toe sobriety test. They describe him at the station during booking as talkative, "moderately intoxicated," able to walk by himself and to comprehend and respond to the officers. Once again, even if a factfinder is permitted to discredit this apparently undisputed evidence, plaintiff's persuading the factfinder to do so is not equivalent to producing evidence supporting a finding to the contrary. Furthermore, it is uncontested that Marquardo was intoxicated for some time period that night and that the police officers found a near-empty bottle of Peppermint Schnapps open in his car.

Plaintiff contends that the evidence from witnesses who observed Marquardo before

and after his arrest establishes that his physical and mental condition was so deteriorated that the officers could not have or should not have failed to recognize that he was under the influence of drugs. She relies on the statements of four people, Christos Terzakis and his daughter Elani Terzakis, who observed Marquardo around 8:30 p.m. that night at the Dairy Barn variety store in Winchester, Jude Castro who was detained in the cell next to Marquardo's until approximately 11:30 that night and Thomas Zazzara, a friend of Marquardo's who observed Marquardo driving and spoke with Marquardo sometime between 8:00 p.m. and 9:00 p.m. on the night of the 31st.

The evidence from two of plaintiff's witnesses, Christos Terzakis and his daughter Elani, if it has any effect, however, supports the statements of the police officers that Marquardo's physical behavior suggested that he was moderately drunk. Both Christos Terzakis and Elani Terzakis stated that Marquardo appeared to them to be drunk, but was able to stand, walk and talk coherently. C. Terzakis Dep. at 16–20, E. Terzakis Dep. at 8–10.

Jude Castro's affidavit states only that he heard Marquardo yelling loudly in an angry manner, but that he could not make out what Marquardo was saying. The fact that Marquardo was yelling and that Castro could not make out what Marquardo was saying, however, is not evidence that Marquardo was exhibiting signs of drug rather than alcohol abuse.

■ Thomas Zazzara states that he saw Marquardo driving erratically between 8:00 and 9:00 p.m. on the night of December 31, 1983 and stopped him. Zazzara describes Marquardo at the time as "bombed" and "completely out of it," with "his eyes rolling around back into his head" and "no control over his neck." Zazzara also claims that Marquardo was "incoherent," had very slow slurred speech and was "hardly able to respond" at all. Zazzara concludes that it was obvious to him that "Vincent Marquardo was extremely impaired, physically and mentally" and was "in need of immediate medical help." Zazzara does not

say, however, that he had any indication that Marquardo was under the influence of drugs as opposed to alcohol. Zazzara does describe Marquardo as more severely intoxicated than do the defendants. The nature and degree of impairment described, however, are still consistent with a diagnosis of alcohol intoxication alone. In addition, this evidence does not establish that Marquardo exhibited the same degree of impairment when he encountered the police officers between one-half to one and one-half hours later. Zazzara's stated conclusion that Marquardo was in obvious need of medical attention is not sufficient to create a genuine issue of material fact. *Cf. Benson v. Cady,* 761 F.2d 335, 338 (7th Cir.1985) (noting that adding bare legal conclusion that defendants were deliberately indifferent will not save complaint).

■ Nor were the officers constitutionally required to provide Marquardo with greater supervision than he received. Plaintiff has not established that Marquardo received no supervision. Although the Castro affidavit asserts that no police officer checked on Marquardo from the time Marquardo was placed in his cell until 12:00 midnight or 1:00 a.m., plaintiff's complaint states that Castro was bailed out at approximately 11:30. Therefore, defendants' sworn allegations that Marquardo was checked and found asleep and snoring at approximately 11:45 p.m., 12:00 midnight, 12:13 a.m. and 1:03 a.m. remain undisputed. Even if a jury does not accept the statements of defendants, they are not free to find to the contrary when plaintiff proffers no evidence to support a contrary finding. Such supervision, when the officers were not aware of a serious medical need, is not an adequate basis for a finding of gross negligence or worse. *See State Bank of St. Charles v. Camic,* 712 F.2d 1140 (7th Cir.1983), *cert. denied,* 464 U.S. 995, 104 S.Ct. 491, 78 L.Ed.2d 686 (1983) (granting summary judgment despite officers' leaving detainee unattended for 52 minutes). *Cf. Holland v. Breen,* 623 F.Supp. 284 (D.Mass.1985) (refusing to dismiss a complaint which alleged deceased had been left

in unsupervised cell after being beaten by police officers).

■■■ The defendants' failure to give a blood test or medical examination to Marquardo, and their practice not to do so for every individual who appears to be intoxicated only by alcohol and in no physical danger, also does not exhibit gross negligence. Plaintiff presents no evidence that the officers had any experience with incidents of this type that would have alerted them to the need for these precautions, or that Town policy, regulation or the practice in that facility required or even recommended it. Even if it were gross negligence for the Town not to have established such a policy, the individual officers cannot be liable for the failure to take these steps when no such policy existed. The conduct of the officers in following the procedures established for them to follow and using the forms provided does not rise to the level of the kind of serious neglect that is required to meet the "substantive" Due Process standard, even if that standard is defined more favorably for pretrial detainees than for prisoners, within the limits observed in Part II, above.

Plaintiff, therefore, has not presented evidence from which a jury could infer that the police officers were in fact alerted to possible drug use by Marquardo or that they were grossly negligent in failing to detect his serious medical condition. Defendant police officers thus have demonstrated that there is no genuine issue as to any material fact, and are therefore entitled to summary judgment.

## IV. Liability of the Town of Winchester, the Chief of Police and the Town Selectmen

Plaintiff asserts claims against the Town of Winchester, the Winchester Chief of Police and five Winchester selectmen under two theories. First, she alleges that they are subject to derivative liability for adopting and condoning the unconstitutional policies and practices of the individual police officers. Second, she alleges that they are directly liable for the failure to provide adequate jail facilities, equipment and procedures.

### A. Derivative Liability

In light of the conclusion in Parts II and III above that the individual officers did not inflict injury upon Marquardo in violation of his constitutional rights, the Town and Town officials cannot be derivatively liable for what was not a violation in the first place. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S.Ct. 1571, 1573, 89 L.Ed.2d 806 (1986) (*per curiam*) (holding that there is no derivative liability for city and police commission whose regulations allegedly authorized use of excessive force where jury found individual officer did not violate constitutional rights by inflicting the injury on plaintiff).

### B. Direct Liability

#### (1) The Standard of Liability for the Town and Supervisory Officials

■■■ Though not subject to derivative liability, the Town, the selectmen and the Chief of Police may be liable directly for their implementation of procedures and the provision of or failure to provide facilities, if their conduct in this respect is constitutionally inadequate. The standard of protection for pretrial detainees, explained in Part II above, applies not only to plaintiff's claims against individual officers but also to her claims against the Town and its supervisory officials. *See Voutour v. Vitale*, 761 F.2d 812, 820 (1st Cir.1985) ("We agree ... that a section 1983 claim based on lack of proper police training requires, at very least, proof of gross negligence both as to the Police Chief and the Town.") Thus, in order to prove a violation of Marquardo's constitutional rights by the Town and its supervisory officials, plaintiff must prove, at a minimum, that the Town and its officials were something more than negligent in their practices and must show that the practices were not reasonably related to a legitimate government purpose.

■■■ Given this requirement, not every failure to provide medical facilities, supervision, or treatment constitutes a denial of due process. As noted by the Eleventh Circuit in *Hamm v. DeKalb County*, 774 F.2d 1567, 1573 (1985),

states forever can improve the quality and quantity of the food, living space, and medical treatment that they provide those incarcerated merely by increasing and properly administering the amount of money they spend on a detention facility.

Choices to provide more limited services, made for the purpose of avoiding higher costs, may in some instances be justified as serving a legitimate government purpose. *See Hamm,* 774 F.2d at 1573. *See also Bell v. Wolfish,* 441 U.S. at 540, 99 S.Ct. at 1874 ("The Government also has legitimate interests that stem from its need to manage the facility in which the individual is detained."). The failure to provide medical care, supervisory procedures or facilities for pretrial detainees rises to the level of a violation of due process, therefore, only if it fails to meet a "minimally adequate level." *Hamm,* 774 F.2d at 1573. Absent a violation of this standard of minimal adequacy, the Constitution leaves administration of jails to the decisions of Town officials and the political process. The courts are not to make "judgment calls" to determine which of various marginally different conditions for jail facilities is more appropriate. *See Bell,* 441 U.S. at 562, 99 S.Ct. at 1886, *Hamm,* 774 F.2d at 1573.

Applying this constitutional standard to the present case, I conclude, for the reasons stated in Parts (2) and (3) below, that plaintiff has not provided sufficient evidence to support a determination that there is a genuine dispute of a material issue of fact as to whether Marquardo's death was caused by any procedures or facilities of Winchester jail that were below minimal adequacy.

### (2) Expert Opinions on the Ultimate Issue

Plaintiff's claims against the Town and Town officials for inadequate medical screening procedures and supervision rely primarily on the statements of plaintiff's police expert, Robert Di Grazia, to establish that the procedures and facilities provided were inadequate. Before addressing those issues, the court must consider the admissibility and materiality of Di Grazia's testimony.

 Plaintiff argues that the statements of the police expert, Di Grazia, establish a material dispute of fact as to whether the failure to have the screening and supervision in question was a constitutional violation. The mere statement of the expert, however, that in his opinion the facts do or do not meet this particular legal standard does not create a genuine issue of material fact. *See In re Air Crash Disaster at New Orleans,* 795 F.2d 1230, 1233 (5th Cir.1986).

 It is true that under Fed.R. Evid. 704 and 705, the opinion of an expert, even on an ultimate issue, may be received in evidence at trial before the foundation for the opinion is stated. This rule applies, however, only if the opinion *is otherwise admissible.* The court cannot determine that an opinion is otherwise admissible without requiring a proffer that discloses whether the premises upon which the opinion is based include assumptions about the applicable legal standard that are incorrect. Moreover, even if an expert correctly *states* the applicable legal standard, if he gives no reasoned explanation as to how he reaches his conclusion and instead merely states an ultimate conclusion that the legal standard was violated, there is no way to determine whether or not he is *applying* the legal standard correctly.

 In a jury trial, there is an uncontrollable risk of unfair prejudice if the jury is allowed to hear an expert opinion that a defendant's conduct constitutes negligence, or gross negligence, or violates a minimal standard, when the expert may be applying an erroneous definition of the legal standard or may be misapplying the standard, though correctly defining it. The argument that this problem might be addressed by cross-examination during trial falls short of a satisfactory answer. The problem is deeper, because the issue concerns not merely the reliability and credibility of the witness and the debatable factual premises of his opinion, all of which may be tested in cross-examination, but also the

likelihood that the opinion is based on a faulty legal premise. Thus, the admissibility of the proffered opinion must be determined before the opinion can be considered by the court as evidence presenting a genuine dispute of fact. The risk that the proffered expert opinion is based on a faulty legal premise is of particular concern in the present case because Di Grazia stated in his deposition that he believed that "accepted standards" were synonymous with "state of the art" in the field. Dep. at 74. Thus, it appears likely that (rather than merely uncertain whether) his opinion is based on a view of legal issues that would hold the Town of Winchester and its officials to a standard more demanding than that the Constitution imposes.

It is the court's responsibility to determine whether the underlying factual evidence is sufficient to support the ultimate conclusion. The expert's expression of the ultimate conclusion alone does not improve the plaintiff's case against summary judgment or directed verdict. If the law were otherwise, the testimony of expert witnesses could cause the ultimate issue "too easily [to] become whatever an expert witness says it is." *See In re Air Crash Disaster at New Orleans*, 795 F.2d at 1233 (noting that "trial courts must be wary lest the expert become nothing more than an advocate of policy before the jury.") Expert testimony must not be allowed to circumvent the purposes of summary judgment in this manner. *See Merit Motors, Inc. v. Chrysler Corp.*, 569 F.2d 666, 672–73 (D.C. Cir.1977) (noting that Rule 703 was not intended "to make summary judgment impossible whenever a party has produced an expert to support its position.")

Thus, although Di Grazia proffers testimony that the failure to have the procedures and facilities he recommends is both "below state of the art" and below "accepted standards," Dep. at 73–74, and that the procedures followed by the Town of Winchester with regard to Marquardo constituted negligence, deliberate indifference and conduct below minimally accepted standards, Dep. at 73–74, 145–46, his opinion alone, unsupported by evidence of the extent of use, if any, of the procedures he

describes, or the extent, if any, of adoption of any rule, regulation, or guidelines requiring them, either in Massachusetts or nationally, is insufficient to prevent summary judgment against the plaintiff. The mere opinion of an expert witness that a jail ought to provide better facilities and supervision is hardly a sufficient basis for a federal court to intervene in the internal management of state and local holding facilities.

For these reasons I conclude that the proffered testimony of Di Grazia that a particular procedure or policy was negligent, grossly negligent, deliberately indifferent, or below minimally accepted standards is not sufficient to create a genuine dispute of material fact.

### (3) Expert Testimony on Subsidiary Facts

In contrast, it is proper for the court to take account of an expert's proffered testimony to the extent that it provides factual support for his contentions, in the form of evidence of the practices in other jails, or rules, regulations or guidelines on jail procedures.

■ In fact, however, Di Grazia points to no regulation, study or guideline that requires the facilities or supervision he suggests. For example, he offers no evidence that the placement of a time-clock at the far end of the cells from the monitoring officer's desk is in any way recommended or required, except by his own opinion. With regard to the frequency of inmate checks, the only standards to which Di Grazia points require cell checks only every thirty minutes. The most favorable evidence plaintiff can point to in this case would arguably support a finding that during the relevant period before Marquardo's death, the longest of any time lapse between checks was 37 minutes (between 1:03 and 1:40 a.m.). A difference of seven minutes from the recommended checking interval in one instance is not sufficient to support a finding even of negligence. Still more clearly it fails to support a finding of

violation of a standard that requires proof of gross negligence or more.

In his testimony concerning audio or video equipment, Di Grazia concedes that there is no one accepted standard applicable to a Town's holding facility. Dep. at 74. He argues that the American Correctional Association, "ACA," *Manual of Standards for Adult Local Detention Facilities,* Second Edition, April 1981, describes audio or visual equipment as essential in a holding facility. But the standard in effect at the time states that such equipment is to be used, not for full-time monitoring of individual detainees, but "primarily in hallways, elevators, corridors, or at points on the security perimeter, such as entrances and exists." The standard states

> Electronic surveillance devices, such as television cameras and listening devices, should not be used to invade the personal privacy of inmates. They may be used in observing special management inmates when approved by the facility administrator. They are not a substitute for staff supervision or for contact with correctional personnel.

*Id.,* Standard 2–5168. Furthermore, despite the testimony of plaintiff's experts that Marquardo might have shuddered or gurgled before passing out from drug abuse, plaintiff has not proffered evidence to support a finding that Marquardo did in fact make such visible or audible motions. Plaintiff's evidence, therefore, would not support a finding that Marquardo's death would have been avoided had audio or video equipment been used by the jail.

■ The only inadequacy to which Di Grazia points for which he offers evidence that the failure is in violation of a procedure recommended in manuals of jail guidelines is the failure to use a booking form that includes questions about whether the detained person is on medication or has ingested drugs. The applicable ACA standard, 2–5273, lists such screening as mandatory. Di Grazia also submits two sample screening forms that request such information.

This evidence, also, is insufficient to establish a genuine issue of material fact as to the liability of the Town officials. Although the standard of the ACA is evidence on the issue of what is minimally accepted practice for a holding facility, when no more evidence than this has been offered, the evidence as a whole is not sufficient to allow a reasonable juror to find that it was a violation of a constitutional standard for the jail not to have such a question on its booking form. As noted by the Supreme Court in *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), although such standards "may be instructive, in certain cases, they simply do not establish the constitutional minima; rather, they establish goals recommended by the organization in question." *Id.* at 543–44 n. 27, 99 S.Ct. at 1876 n. 27. The recommendations of the ACA alone, therefore, are not a sufficient basis for a juror to find that the defendants violated the Constitution by failing to require inquiry into drug intake.

■ Finally, with respect to the claim that the Town failed to provide drug training, plaintiff has not even presented evidence sufficient to show a causal link between any such insufficiency and Marquardo's death. *See Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 692, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978) (holding that in order to prove a constitutional violation by a Town or its supervisory officials, the plaintiff must show that any allegedly inadequate practice was a cause of the injury). As noted in Part III, plaintiff's evidence fails to provide a basis upon which a reasonable juror could conclude that the officers could have detected the drugs if they had received such training. Plaintiff's evidence, therefore, fails to support the inference that Winchester's failure to provide additional drug detection training was a cause of Marquardo's death.

Even assuming in plaintiff's favor the most favorable among the legal standards arguably supported by precedent, therefore, plaintiff's claims against the Town and its supervisory personnel are not supported by evidence sufficient to establish a genuine issue of material fact. Absent factual particulars that disclose triable issues

of fact, a motion for summary judgment must be granted. *White v. Hearst Corporation*, 669 F.2d 14, 20 (1st Cir.1982).

### IV. Qualified Immunity

■ Defendants have also moved for summary judgment on the ground that they are entitled to official immunity because it was not clearly established at the time their actions were taken that the actions violated constitutional law. In light of the conclusion in Parts II and III, above, that the defendants' actions did not violate a constitutional standard *even under current precedents,* when interpreted in a way resolving ambiguities favorably to plaintiff, it follows that an objectively reasonable official could not have known *at the time of their conduct* that it was forbidden. *See Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987) ("The contours of the right must be sufficiently clear that a reasonable official would understand that *what he is doing violates that right.*") Thus, defendant officials Dean, Donaghey, Culhane and McHugh are also entitled to summary judgment on the ground that they are immune from liability because it was not clearly established at the time of their actions that those actions were in violation of the Constitution. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).

■ The Town of Winchester has also moved for summary judgment on this added ground, contending that it too is entitled to a qualified immunity. Good faith or qualified immunity, however, is afforded to public officials to protect their freedom and discretion in performing their jobs. *Harlow,* 457 U.S. at 816–818, 102 S.Ct. at 2738. It does not shield municipalities for conduct that violates constitutional standards. *See Owen v. City of Independence,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980). I have determined above that the Town of Winchester is entitled to summary judgment on other grounds, but this added defense of qualified immunity is not available as additional support for that conclusion.

### V. Immunity From State Law Claims

■ Defendants Dean, Donaghey, Culhane and McHugh also move for summary judgment on any state law claims against them under the Massachusetts Tort Claims Act, which provides that a public employee is not liable for "personal injury or death caused by his negligent or wrongful act or omission while acting within the scope of his office or employment." Mass.Gen. Laws ch. 258, § 2. Also, as noted by plaintiff, it appears that plaintiff's complaint alleges violations of Massachusetts law only against the Town of Winchester. Plaintiff concedes that Dean, Donaghey and Culhane are immune from state law claims under this statute. Defendant Chief McHugh is also a public employee and is therefore also entitled to this immunity. The defendants Dean, Donaghey, Culhane and McHugh are therefore also entitled to summary judgment on any state law claims against them.

### ORDER

For the foregoing reasons, it is ORDERED:

(1) All defendants' Motions for Summary Judgment on the claims under 42 U.S.C. § 1983 are allowed.

(2) Defendants Dean, Donaghey, Culhane and McHugh's motions for summary judgment on state law claims against them are allowed.

(3) A conference is scheduled for 4:00 p.m., Tuesday, March 14, 1989, to consider whether the court should retain pendent jurisdiction over the remaining claims, and, if so, to schedule further proceedings.