DAVID D. DOWD, JR., Senior District Judge,
dissenting.
I cannot join the majority’s opinion because I am not convinced that the record supports a conclusion, on summary judgment, that there was probable cause for the arrest of Willis. Even though I might be able to agree that there is probably no individual liability on the part of the various officers, where I part company is with the majority’s conclusion regarding the possibility of liability under Monell v. New York City Dept, of Soc. Servs., 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). To that extent, I respectfully dissent. I would remand on this issue and allow a jury of Willis’s peers to decide whether there is any Monell liability for the arrest of Willis.
If the focus is solely on what happened in the Dayton, Tennessee airport on October 7, 2003, the district court’s conclusions are probably correct; that is, there may be no individual liability on the part of the individually named officers and deputies. That does not, however, automatically mean that there can be no municipal liability.
As aptly explained in Epps v. Lauder-dale County, Tennessee, 45 Fed.Appx. 332, 333-35 (6th Cir.2002) (Cole, J., concurring):
... I write separately ... to clarify my understanding of City of Los Angeles v. Heller, 475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986) (per curiam), that a municipality may still be held liable for a substantive due process violation even when the individual officer is absolved of liability.
When no constitutional harm has been inflicted upon a victim, damages may not be awarded against a municipality. Heller, 475 U.S. at 799,106 S.Ct. 1571. But a finding that the individual government actor has not committed a constitutional violation does not require a finding that no constitutional harm has been inflicted upon the victim, nor that the municipality is not responsible for that constitutional harm. See City of Canton v. Harris, 489 U.S. 378, 388-89 n. 8, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) (noting that the deliberate indifference standard for municipal liability is independent from the state of mind standard used to establish the liability of an individual government actor); see also Collins v. City of Harker Heights, Texas, 503 U.S. 115, 121-22, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992) (highlighting the “separate character of the inquiry into the question of municipal responsibility and the *746 question whether a constitutional violation occurred.”). I read Heller to prohibit municipal liability only when the victim suffers no constitutional injury at all, not when the victim fails to trace that constitutional injury to an individual police officer. Cf., e.g., Claybrook v. Birchwell, 199 F.3d 350, 361 (6th Cir.2000) (citing the language of Heller to deny a victim’s substantive due process claim, but not addressing the case where the victim actually did suffer a constitutional injury).
A given constitutional violation may be attributable to a municipality’s acts alone and not to those of its employees — as when a government actor in good faith follows a faulty municipal policy. See Pembaur v. City of Cincinnati, 475 U.S. 469, 480, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); Dodd v. City of Norwich, 827 F.2d 1, 9 (2d Cir.1987) (Pratt, J., dissenting) (noting that the city’s policy could be unreasonable, “even if [the individual government actor] himself, who was trained to follow that policy, was found to be not negligent in his own conduct.”). A municipality also may be liable even when the individual government actor is exonerated, including where municipal liability is based on the actions of individual government actors other than those who are named as parties. See Praprotnik v. City of St. Louis, 798 F.2d 1168 (8th Cir.1986), rev’d on other grounds, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988); de Feliciano v. de Jesus, 873 F.2d 447 (1st Cir.1989); Carapellucci v. Town of Winchester, 707 F.Supp. 611 (D.Mass.1989). Moreover, it is possible that no one individual government actor may violate a victim’s constitutional rights, but that the “combined acts or omissions of several employees acting under a governmental policy or custom may violate an individual’s constitutional rights.” Garcia v. Salt Lake County, 768 F.2d 303, 310 (10th Cir.1985).
My concern is focused on what may be the separate official policies of the City of Dunlap, Sequatchie County, and Rhea County, to permit their law enforcement personnel to participate in “takedowns” by the Task Force without any attempt to ascertain for themselves whether there is a factual basis to believe there is probable cause for an arrest.
The majority affirms the judgment of the district court with respect to the § 1983 claim on the ground that Willis’s arrest was supported by probable cause.[6] To reach this conclusion, the majority cites Collins v. Nagle, 892 F.2d 489, 496 (6th Cir.1989) for the proposition that probable cause may be established from the collec *747 tive knowledge of the police. I do not disagree with this legal proposition; however, the record does not support the existence of the requisite collective knowledge.
The majority declares that “John Marshall told McMillon that Robertson and his father, Jack Marshall, would accompany him [on the plane] and that his father’s girlfriend might also be on the plane[,]” that “everyone on the plane knew to keep their mouths shut[,]” and that John Marshall “indicated that he would be armed.” (Maj.Op. at....). This information was supposedly given to the Task Force officers by Smith or Sain during the briefing conducted on the morning of October 7, 2003 and forms the “collective knowledge” supporting “probable cause” for the arrest of Willis.
The flaw not acknowledged by the majority is that the record contains no testimony or affidavit from Smith or Sain regarding what McMillon may or may not have told them and/or what they, in turn, told the Task Force, and there are only brief excerpts from the deposition of McMillon himself.[7] Both the district court and the majority improperly drew all inferences in favor of the defendants apparently based on vague testimony from the various defendants (but not from Smith or Sain) about what impressions the defendants had regarding the underlying facts of the takedown.[8] Both the district court *748 and the majority seem to rely on deposition testimony of McMillon as to what he learned from John Marshall; but — and this is very important — there is nothing in MeMillon’s deposition testimony or in the record as a whole that makes clear that he actually passed any of this particular information on to Smith or Sain. Since there is no testimony from Smith or Sain, we really do not know for sure what Smith or Sain knew much less what they communicated to the Task Force members. Without knowing what Smith or Sain knew, we cannot declare on summary judgment (where all inferences must be drawn in favor of the non-movant) that they had probable cause to arrest Willis and that, therefore, the other officers were permitted to rely on Smith’s and Sain’s probable cause determination. These are facts for a jury to find, not for a court to conclude by drawing unsupported inferences from a vague record.
In my view, because Huth and Hitchcock (acting in their official capacities as agents and policy-makers for the City of Dunlap and Sequatchie County, respectively), and Argo (acting in his official capacity as agent of Neal, who is the policy-maker for Rhea County) were all involved in decision-making capacities during the relevant pre-takedown time frame, if the facts support a conclusion that they all proceeded to the Dayton, Tennessee airport without even a minimal attempt to ascertain for themselves whether there was a sufficient basis to support a probable cause determination that would justify their independent participation in what appears to have been a warrantless takedown, they were all, to that extent, “involved in” Willis’s arrest.
Since this was not a Terry stop that escalated into an arrest but, rather, simply an outright arrest, if it was without probable cause and if it resulted from “a faulty municipal policy,” Epps, supra, at 334, then one or more of the governmental entities may be liable. The district court dismissed the City of Dunlap, Sequatchie County and Rhea County, concluding that, since none of the individual officers had violated Willis’s constitutional rights, there was no basis for finding municipal liability. At the very least, there are material factual disputes which must be sorted out by a jury before anyone can reach the conclusion that there is no basis for municipal liability. If it eventually proves true that the policy of these governmental entities was simply to rely blindly on assertions by Task Force Officers Smith and Sain as to probable cause determinations, in a situation where urgency is not a factor, then the governmental entities can be held liable.[9] See Pembaur v. City of Cincinnati, 475 U.S. 469, 480, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (“it is plain that municipal liability may be imposed for a single decision by municipal policymakers under *749 appropriate circumstances”) (citing Monell, 436 U.S. at 694, 98 S.Ct. 2018, for the proposition that the acts and decisions of certain officials can be found to represent official policy).
In my view, the problem here is not so much what happened at the airport but what happened at a policy level before October 7, 2003. As explained above, it is the apparent policy of these governmental entities to permit their officers and deputies to rather blindly participate in activities initiated by the Task Force without any independent assurance that there is a factual basis for those activities. In this case, that apparent policy resulted in an arrest without probable cause for which the various governmental entities may be liable.
I would affirm the district court as to all but its ruling regarding municipal liability and remand for further proceedings with respect to this issue alone as it relates to defendants Rhea County, Sequatchie County, and City of Dunlap.

. The district court actually improperly characterized this takedown as a Terry stop which does not require probable cause. As very recently noted by another panel of this circuit:
... An officer may permissibly conduct an investigatory stop when he or she can point to "a particularized and objective basis” that "leads ... reasonably to [the conclusion] in light of [the officer’s] experience that criminal activity may be afoot and that the persons with whom [the officer] is dealing may be armed and presently dangerous.” Teny v. Ohio, 392 U.S. 1, 30, 88 S.Ct. 1868,'20 L.Ed.2d 889 (1968); Houston v. Clark County Sheriff Deputy John Does 1-5, 174 F.3d 809, 813 (6th Cir. 1999). Reasonable suspicion for an investigative stop must be considered under the totality of the circumstances, considering “all of the information available to law enforcement officials at the time.” Feathersf v. Aey], 319 F.3d [843] 849 [(6th Cir.2003)].
Humphrey v. Mabry, 482 F.3d 840, 846 (6th Cir.2007). This was not an investigatory stop based on an officer’s hunch about something he or she had observed in the course of the officer's duties or on some sort of information from a dispatcher that required a quick response. This was a planned takedown and, for that reason, there is little or no justification for allowing any benefit of a doubt.

. I have not relied solely on the Joint Appendix which, as is typical, is quite inadequate. I went directly to the electronic docket of the district court believing I would find more sworn testimony by way of depositions and the like. I was sorely disappointed, finding only the same inadequate excerpts of depositions. It is one thing for the Joint Appendix not to contain the evidence; it is another thing entirely for the district court record not to contain it.

. The various defendants’ sworn testimony is too vague to rely on, without a jury finding. For example, defendant Huth’s affidavit simply acknowledges that he and the others were ”brief[ed] regarding the money laundering operation.” (JA 49 11 9). In Huth’s deposition, he indicates that Smith called him a few days before October 7, 2003 to enlist his help, but that Smith did not even indicate how many people would be on the plane (JA 51), other than that "there would be multiple people on the plane.” (JA 53). Huth's deposition recollection of the briefing was "that there was going to be an airplane coming in there in Dayton, and that it was involving this money laundering operation he [Smith] had been working.” (JA 52-53). Huth states: "And basically, that was pretty much about it.” (JA 53). Huth knew nothing about the particulars of the investigation. (JA 110).
Defendant Neal testified at his deposition that, after a call from Smith asking for help, Neal contacted his chief deputy, defendant Argo. Neal told Argo that he "didn't know what the operation [at the airport] was[.]” (JA 159). He further testified that the only thing he knew was "that it involved jewelry and they said money laundering[.]” (JA 160). In fact, Neal did not believe he and his officers did anything more than "help do the security[ ]” for the operation. (Id.).
Defendant Argo testified at his deposition that "Rick Smith advised that they had an ongoing investigation involving some jewelry and money laundering, that some people were flying up from Florida, that they would be flying into the Dayton Airport, and they needed some assistance on securing the plane and the personnel on the plane.” (JA 165). Argo was not even told whether the people would be male or female. (Id.). He thought he had been told that "one or more could be armed[.]” (Id.). Argo only knew that he was to wait for a signal from Smith "to take them down.” (JA 166).
Defendant Hitchcock testified that Smith “just told that they was supposed to be a plane coming in with some jewels on it, something about some money laundering, and that’s about it.” (JA 181). Hitchcock also thought that Smith had "ma[d]e a statement that one subject might be armed.” (Id.).
All the defendants seem to agree that the officers who showed up to help on October 7, 2003 were divided into two teams, one to secure the airplane and one to secure the people coming off the plane.

. Even the Interlocal Cooperation and Mutual Aid Agreement, under which the Twelfth Judicial District Drug Task Force had enlisted the aid of the officers of these various governmental entities for this takedown, recognizes that officers do not relinquish any responsibility simply by participating in the Task Force activities. The Agreement provides, in part, as follows:
12. LIABILITIES. Officers Assigned to the Drug Task Force Remain Employees of Their Hiring Agency. Each law enforcement officer assigned to the Drug Task Force will remain an employee of the local government by which the officer was employed prior to the assignment. The conduct and actions of such officer will remain the responsibility of the local government employing the officer. Any civil liability arising from the actions of a law enforcement officer engaged in Drug Task Force activities will be assumed by the employing local government in the same manner and to the same extent as if the actions were committed within the jurisdiction of the employing local government during the normal course of the officer’s employment, independent of the Drug Task Force....