Rose E. LIGHTBODY, Administratrix of the Estate of Louis S. Lightbody, Sr.

v.

The TOWN OF HAMPTON.

Civ. No. 82–277–D.

United States District Court, D. New Hampshire.

July 31, 1984.

Law Offices of James J. Kalled by James J. Kalled, Ossipee, N.H., for plaintiff.

Shaines, Madrigan & McEachern by John H. McEachern, Portsmouth, N.H., Burns, Bryant, Hinchey, Cox & Shea, by Donald R. Bryant, Dover, N.H., for defendants.

## ORDER

DEVINE, Chief Judge.

Plaintiff Rose Lightbody, Administratrix of the Estate of Louis Lightbody, and a citizen of Massachusetts, sues defendant Town of Hampton, an incorporated New Hampshire town, for the wrongful death of Louis Lightbody. Jurisdiction ostensibly is founded upon diversity of citizenship.[1] 28 U.S.C. § 1332. Hampton moves to dismiss Count II of the complaint for failure to state a claim upon which relief can be granted. Rule 12(b)(6), Fed.R.Civ.P. Matters outside the pleadings have been presented by both parties and considered by the Court, so the motion shall be treated as one for summary judgment as provided in Rule 56. Rule 12(b), Fed.R.Civ.P.

Count II claims that Hampton, in contravention of decedent's civil rights, willfully and with wanton neglect confined decedent in a jail known by defendant to be inadequately designed and supervised, resulting

---

1. The civil rights violations alleged by administratrix are properly founded upon 28 U.S.C. § 1343, as authorized under 42 U.S.C. § 1983.

in decedent's death by suicide. The complaint in brief notes that on or about November 29, 1980, decedent was arrested by members of the New Hampshire State Police for driving while intoxicated, N.H. RSA 262-A:62. State Police officers brought decedent to the Hampton Jail and left him in the custody of the Hampton Police. Decedent was placed in a jail cell, and subsequently hung himself. Administratrix alleges that the confinement of the decedent in a facility that defendant knew was inadequately designed and supervised to prevent suicides, which deficiencies defendant refused to correct despite four prior suicide attempts; and about which the Chief of Police of Hampton prior to decedent's suicide stated that it was just a matter of time before someone hangs himself at the Jail, amounts to a deprivation of life and person in contravention of the Fourteenth Amendment, and cruel and unusual punishment under the Eight Amendment.

The facts are as follows. On November 29, 1980, at approximately 10:30 p.m., the decedent, Louis Lightbody, was stopped and arrested by New Hampshire State Troopers Colon Forbes and Robert Bruno for driving while under the influence of intoxicating liquor on Interstate 95 in Hampton Falls, New Hampshire. Lightbody failed the field sobriety test performed at the request of the Troopers. The Troopers elected to transport Mr. Lightbody to the Hampton Police Department in lieu of transporting him to either a local hospital or another jail facility.

The Town of Hampton maintains a Jail at its Ashworth Avenue station. The lockup is used by the Hampton Police Department as well as the communities of Rye, Seabrook, and North Hampton. The New Hampshire State Police also use the Hampton facility. The staffing and supervision of the Jail varies during the year due to seasonal fluctuations in the numbers of people using the New Hampshire seacoast area. During the summer, Hampton staffs its Jail with at least two booking officers. Off-season, the Jail is not staffed; the only person in the station throughout a shift is the dispatcher.

From the time decedent was placed in the cell until he was found hanged, the only Hampton employee in the station was the dispatcher. Hampton Police Department Rules and Regulations provided:

5.13 ... the prisoner shall under no circumstances be left in the custody of any civilian employee of the department except when absolutely necessary in any emergency.

The facts do not indicate whether the dispatcher was a civilian employee.

Upon arriving at the Hampton Police Department, where a blood alcohol content test was to have been performed, it was learned that the breathalyzer was inoperable. The decedent was transported to the Seabrook, New Hampshire, police station where a breath test revealed his blood alcohol content to be .30. The Alcoholic Influence Report indicates decedent had earlier taken Valium and was diabetic, last having taken insulin that morning. He was transferred back to the Hampton Police Department and was booked and held pending bail.

The arresting officers, Hampton and non-Hampton, book their own prisoners, following Hampton's booking procedures, so far as they know them. Although Hampton has printed rules and regulations relating to jailing procedures, these are not made available to non-Hampton officers. Once a prisoner is placed in the Jail and the cell door closes, he is the responsibility of the Hampton Police Department. The Hampton Police Department learns that a prisoner has been placed in the Jail when the arresting officer tells the Hampton dispatcher. In this case, the dispatcher was advised that the decedent was in his cell. The shift supervisor is to be notified by the dispatcher if he is out on patrol when a prisoner is placed in the Jail. This is not a procedure that is always done. In this case, the dispatcher did not notify the shift supervisor that decedent had been brought in. The shift supervisor first learned of decedent's presence when asked to respond to the suicide.

Hampton requires that the arresting officer enter on a Daily Prisoner Log his name; the prisoner's name, age, and cell number; the time of arrest; the charge and bail; and whether his phone call had been made. The arresting officer is to complete a Uniform Arrest Report. Neither the Daily Prisoner Log nor the Uniform Arrest Report calls for any information regarding a jailed person's blood alcohol content, his physical or mental condition, or whether he had been taking any medications. There is no requirement that the non-Hampton arresting officers ascertain whether there is a Hampton officer physically present in the station before incarcerating a prisoner. Although the arresting officers might stay in the station after placing the person in a cell, they have no continuing responsibility for his care. The Troopers who had arrested and jailed decedent were still present in the Jail when decedent committed suicide.

After being booked, decedent was advised that his bail would be $275. He was allowed to make a telephone call per Hampton Police Department Rules and Regulations, Jail Procedure ¶ 5.01, and telephoned his mother, Rose Lightbody, informing her of his arrest and the amount of his bail. Trooper Forbes then spoke to Mrs. Lightbody who stated that she would contact someone to bring bail to the Hampton Police Department. This information was passed on to decedent by Trooper Forbes. Shortly after the booking, Trooper Forbes received a telephone call from Mr. John Lightbody, decedent's brother, who informed the Trooper that he was on his way to Hampton from Massachusetts with bail for the decedent. Decedent's belt, shoes, and all personal belongings were taken from his person by the Troopers following Hampton Police Department Rules and Regulations, Jail Procedure ¶ 5.2. The Troopers allowed him to keep his socks, pants, undergarments, shirt, and a down vest because of the cool temperatures in the cell area. Lightbody was placed in a holding cell at approximately midnight.

From the time of his initial stop on Interstate 95 through his being booked and placed in a holding cell, a period of approximately one and one-half hours, decedent was cooperative and friendly. He was able to effectively communicate, dialing the telephone himself and speaking intelligently with his mother and the State Police Officers. His only stated concern was getting bail so that he could get to work at the Seabrook Nuclear Plant. There were no evident outward signs of anger, hostility, frustration, or depression, nor was there any outward indication that Lightbody might bring harm to himself or another person.

At approximately 1:30 a.m., on November 30, 1980, Lt. Dean Glover of the Seabrook Police Department entered the cellblock area for the purpose of jailing several prisoners transported from Seabrook. Once inside, Lt. Glover found Mr. Lightbody had committed suicide using his shirt to hang himself from the cell bars. Resuscitation efforts by the Hampton Police Officers and the Hampton Police Emergency Medical Technicians were unsuccessful.

Hampton alleges that Lt. Glover entered the cellblock in order to check the cellblock prior to entering with prisoners, and that this check was performed within one and one-half hours after decedent had been put in his cell. Hampton Police Department Rules and Regulations provided:

> 5.04 All prisoners shall be visually checked at least once during every two hour interval to assure their safety and well being.

Plaintiff argues that decedent was not found during a cell check for the purpose of determining his well-being, and points out that some Hampton Police employees did not know of or regularly conform to the two-hour cell-check requirement.

According to Hampton Police Chief Robert Mark, department regulations covered how to deal with a person who exhibited a predilection toward suicide. There are no guidelines used to identify a potential suicide. The only way the Department "knows" is if the prisoner says he is going to commit suicide. In that event, cell checks at fifteen-minute intervals are insti-

tuted whenever a person gives any indication of possible suicidal tendencies. Drunkenness also was sometimes a factor in determining frequency of checks. Any and all clothing and personal effects are promptly removed from such prisoners. According to the Chief, when the arrest is made by the State Police or some other town, the Hampton Police Department relies on their observations and recommendations in regard to suicide. If the arresting officer does not believe that a person shows a tendency to commit suicide, cell checks are not reported on the daily journal.

Chief Mark was aware of the potential for suicide in his Jail: "We have had to cut down four people who tried to hang themselves," Mark said, "it's just a question of time before we are caught." He told the police station feasibility committee that lack of security at the beach station is a major item. Mark told the *Hampton Union* that the police had for years requested cameras for the cells and monitoring of the police parking lot, and fencing around the station, and it was "knocked out of the budget". When Chief Mark was Deputy Chief he requested surveillance cameras; his request was rejected. With the exception of decedent's suicide, Chief Mark knew of at least five attempted suicides. He has not kept special records of names, addresses, dates, and details of these various unsuccessful attempts at suicide.

Hampton arrests or holds 250 to 300 people per year for driving while intoxicated. Hampton Police Department Rules and Regulations provided:

4.04 Whenever a person is arrested for a crime and taken to the police station, the duty supervisor shall immediately examine each prisoner booked and if he finds any bruises, cuts, or other injuries he shall forthwith report the matter by making a written report thereof to the Chief of Police. If, in the judgment of the officer-in-charge, the prisoner is suffering from wounds or injuries which require medical attention, physician shall be called.

Chief Mark has had no training in what medical concerns might arise for individuals incarcerated with a high blood alcohol count. Neither the Chief nor anyone in his department has the expertise to say that blood alcohol and the psychological makeup of an individual relate. He has no idea whether a high blood alcohol count raises concerns about a person's health.

In order to succeed in its motion for summary judgment, defendant must demonstrate that, viewing the record in the light most favorable to plaintiff, documents on file reveal that there is no genuine issue as to any material fact and that defendants are entitled to a judgment as a matter of law. *Early v. Eastern Transfer*, 699 F.2d 552, 554–55 (1st Cir.), *cert. denied*, 464 U.S. 824, 104 S.Ct. 93, 78 L.Ed.2d 100 (1983). A dispute of fact is material if it affects the outcome of the litigation, and is genuine if manifested by the substantial evidence going beyond the allegations of the complaint. *Pignons S.A. de Mecanique de Precision v. Polaroid Corporation*, 657 F.2d 482, 486 (1st Cir.1981). The moving party bears the burden of showing that there is no genuine issue as to all the material facts necessary to entitle him to judgment. *Donovan v. Agnew*, 712 F.2d 1509, 1509, 1516 (1st Cir.1983). Defendant must affirmatively show there is no genuine issue of fact as to every relevant issue raised by the pleadings, and once it has done so, plaintiff cannot defeat summary judgment merely by standing on bare allegations. *Emery v. Merrimack Valley Wood Products, Inc.*, 701 F.2d 985, 991 (1st Cir.1983); *Mack v. Cape Elizabeth School Board*, 553 F.2d 720, 722 (1st Cir.1977). Plaintiff must point to facts which if established at trial would entitle her to prevail. *Over the Road Drivers, Inc. v. Transport Insurance Company*, 637 F.2d 816, 818 (1st Cir.1980). Absent factual particulars that disclose triable issues of fact, a motion for summary judgment must be granted. *White v. Hearst Corporation*, 669 F.2d 14, 20 (1st Cir.1982).

Administratrix fashions a claim under the Eighth and Fourteenth Amendments to

the Constitution of the United States. Hampton moves to dismiss, and finds its support in *State Bank of St. Charles v. Camic,* 712 F.2d 1140 (7th Cir.), *cert. denied,* 464 U.S. 995, 104 S.Ct. 491, 78 L.Ed.2d 686 (1983). In *Camic,* the Court of Appeals affirmed the district court's grant of summary judgment to the City of Aurora and some of its police officers who had been accused of violating a decedent's rights by prohibiting him from making a phone call to communicate with supportive persons prior to defendant's placing him into a cell and/or failing adequately to supervise decedent so as to prevent him from committing suicide while he was incarcerated. The theory behind the Eighth Amendment claim was that decedent had a right to be protected from committing suicide. *Camic,* 712 F.2d 1145. Adopting the "deliberate indifference" standard of *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976), the *Camic* court held that even though 42 U.S.C. § 1983 embodies no state of mind requirement, the Eighth Amendment does. *Camic,* 712 F.2d 1146. The Court set as parameters of decedent's state of mind "more than a mere suspicion" on the one hand, and "less than a moral certainty" on the other. *Id.* Finding that defendants had no knowledge of or reason to suspect suicidal tendencies on the part of decedent, even though decedent was intoxicated, uncooperative, had attempted to assault defendants, and was acting "freaky", and finding that defendants did not act with deliberate disregard for the possibility that decedent would take his own life, even though defendants disregarded one or more of their established procedures, such as checking the cells every hour or effectively monitoring by visual or auditory systems the activities of prisoners, the Court held that if an Eighth Amendment right to be protected from suicide existed, it was not abrogated in this case because the defendants' lack of knowledge and their exercise of reasonable precautions, i.e., removing decedent's belt and shoelaces, precluding any possibility of their actions being characterized as deliberate or callous indifference. *Id.*

*Camic* is distinguishable. *Camic* focuses on the rigorous Eighth Amendment "deliberate or callous indifference" standard, but does not address the more lenient Fourteenth Amendment analysis. Although Count 2 claims violations of Eighth and Fourteenth Amendment rights, the latter properly supports plaintiff's claim. The Eighth Amendment protects prisoners or pretrial detainees who allege either an express intent to punish or arbitrary or purposeless restrictions on conditions. *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Decedent was not a convict. He was presumed to be innocent, and any deprivation of his constitutional rights by the state was severely limited. *Smith v. Sampson,* 349 F.Supp. 268, 271 (D.N.H.1972). Decedent was not a pretrial detainee, i.e., one who had a judicial determination of probable cause as a prerequisite to any extended restraint of liberty following arrest. *Bell v. Wolfish,* 441 U.S. 536, 99 S.Ct. 1872. Furthermore, plaintiff does not allege that defendant intended to punish or placed arbitrary or purposeless restrictions on conditions. Plaintiff therefore fails to state a claim under the Eighth Amendment. But plaintiff is not prisoner to the *Camic* court's stringent Eighth Amendment analysis, because she states a claim for deprivation of those constitutional rights secured by the Due Process Clause of the Fourteenth Amendment. *Bell v. Wolfish,* 441 U.S. 535 n. 16, 99 S.Ct. 1872 n. 16; *City of Revere v. Massachusetts General Hospital,* 463 U.S. 239, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983).

Title 42 U.S.C. § 1983 gives to plaintiff the remedy for deprivation of constitutional rights. *Chapman v. Houston Welfare Rights Organization,* 441 U.S. 600, 617–18, 99 S.Ct. 1905, 1915–16, 60 L.Ed.2d 508 (1979). Plaintiff may proceed under section 1983 if the conduct complained of was committed while defendant acted under color of state law and when the conduct deprived decedent of rights, privileges, or immunities secured by the Constitution of the United States. *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 1913–14, 68

L.Ed.2d 420 (1981). Liability under 42 U.S.C. § 1983 may be imposed for action that deprives a person of a constitutional right and for inaction when there is a duty to act to prevent such a deprivation. *Clark v. Taylor*, 710 F.2d 4, 9 (1st Cir. 1983). Defendant acted under color of state law, and its inaction allegedly deprived decedent of his life. Allegations of such conduct that subjects a person to the deprivation of his life under color of state law without due process of law states a claim under 42 U.S.C. § 1983. *Hirst v. Gertzen*, 676 F.2d 1252, 1262–63 (9th Cir. 1982); *Wagar v. Hasenkrug*, 486 F.Supp. 47, 52–54 (D.Mont.1980).

■ More particularly, the death of an arrestee while being held in custody is actionable under 42 U.S.C. § 1983. *Pantoja v. City of Gonzales*, 538 F.Supp. 335 (N.D. Cal.1982). In *Pantoja*, the Court analyzed an analogous situation to the case at bar, and under *Parratt* and its progeny concluded:

> Under the reasoning of *Parratt*, as illuminated by *Logan* [v. *Zimmerman Brush Co.*, 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982)], this case falls squarely within the category of cases attacking an established state procedure (including also the allegedly inadequate training of police officers), as opposed to those attacking random or unauthorized and hence unpredictable acts. Where the deprivation occurs as a result of the established practice, procedure or custom of the state authority, as alleged here, the result is not unpredictable and the state has a constitutional duty to prevent it. A post-deprivation hearing provided by the state in the course of a wrongful death action, which may satisfy due process in cases of random and unpredictable acts, is not adequate here.

*Pantoja*, 538 F.Supp. 338.

■ The various courts have struggled to determine the correct manner in which to analyze claims such as the present one which allege facts that are commonly thought to state a claim for common-law negligence. *See Parratt v. Taylor*, 451 U.S. 533, 101 S.Ct. 1911–12 (and cases cited therein). The Court is admonished not to "make of the Fourteenth Amendment a font of tort law to be superimposed upon whatever systems may already be administered by the states". *Paul v. Davis*, 424 U.S. 693, 701, 96 S.Ct. 1155, 1160, 47 L.Ed.2d 405 (1976); *Parratt v. Taylor*, 451 U.S. 544, 101 S.Ct. 1917. Then what is the standard of care—the duty created by this constitutional quasi-tort? The approach suggested by Justice Powell concurring in *Parratt* appears most appropriate on these facts where defendant allegedly deprived decedent of his life without due process of law. "A 'deprivation' connotes an intentional act denying something to someone, or, at the very least, a deliberate decision not to act to prevent a loss. The most reasonable interpretation of the Fourteenth Amendment would limit due process claims to such active deprivations." *Parratt v. Taylor*, 451 U.S. 548, 101 S.Ct. 1919. The First Circuit adopts this approach, directing that although § 1983 will not afford relief on a complaint of negligence, if plaintiff can establish a sufficient combination of helplessness on the part of the deceased and wanton callousness on the part of defendant, plaintiff might cross the line from tort to a § 1983 case. *Harper v. Cserr*, 544 F.2d 1121, 1124 (1st Cir.1976). These elements are present in plaintiff's complaint. Consequently, plaintiff states a claim under 42 U.S.C. § 1983. Facts outside the complaint reveal outstanding genuine issues of material fact and bar a grant of summary judgment. In light of these disputes and judicial reluctance in granting summary judgment on civil rights actions such as this, *Pinto v. Nettleship*, 737 F.2d 130 (1st Cir.1984), defendant's motion is denied.

Accordingly, defendant's motion for summary judgment on plaintiff's Count II is denied.

SO ORDERED.