724 F.Supp. 662 (1989)
Christopher A. RELLERGERT, a Minor Child of Mark Wayne England, Deceased, by Next Friend, Melanie RELLERGERT, Plaintiff,
v.
CAPE GIRARDEAU COUNTY, MO., Sheriff Norman Copeland and Deputy Paul Bedell, Defendants.
No. S88-107C (5).
United States District Court, E.D. Missouri, Southeastern Division.
October 25, 1989.
*663 Malcolm H. Montgomery, Downs, Johnson & Montgomery, John L. Cook, Thomasson, Dickerson, Gilbert and Cook, Cape Girardeau, Mo., for plaintiff.
A.M. Spradling, III, Spradling & Spradling, Cape Girardeau, Mo., for defendants.

MEMORANDUM OPINION AND ORDER
LIMBAUGH, District Judge.
This 42 U.S.C. § 1983 action was tried to a jury as to defendants Copeland and Bedell only and was dismissed as to Cape Girardeau County, Missouri. Judgment in the amount of $75,000.00 was entered in favor of plaintiff and against defendants Copeland and Bedell on the jury verdict.
There is now before the Court for decision defendants' motion for Judgment Notwithstanding the Verdict or for a New Trial and plaintiff's motion for attorneys' fees. In accordance with the findings set out hereinafter, judgment will be entered for defendants notwithstanding the verdict in favor of plaintiff. The other requests are thereby denied as moot.
On March 16, 1987, Mark Wayne England was sentenced to serve one year in the Cape Girardeau jail for resisting arrest. The sentence was rendered by a state of Missouri circuit court.
England was in jail from March 16, 1987 to May 20, 1987 when he received a bench parole subject to supervised probation. He gained employment at Florsheim Shoe Company and subsequently, lost his job June 17th. England's parole was revoked *664 as he failed to maintain employment and he was returned to the county jail the next day, June 18th to serve the balance of his term.
Three days later on June 21, 1987 and while in jail, England died as a result of a self-inflicted hanging. England was born on August 21, 1968 and at the time of his death lacked two months from attaining his 19th birthday.
Plaintiff, Christopher A. Rellergert, born March 28, 1985 was slightly in excess of two years of age at the time of England's death. The mother of Christopher, Melanie Rellergert, brings this action on her son's behalf claiming Christopher was also England's son. Melanie and England had not married.[1] Although Christopher's paternity was not admitted by defendants, there was no evidence adduced to suggest England was not Christopher's father.
The case against defendants was submitted to the jury on an asserted Eighth Amendment violation. Plaintiff claimed that the acts or omissions of defendants wherein England was not properly monitored while in jail and thereby was able to kill himself by hanging, constituted a deliberate indifference to a prisoner's suicidal behavior. This indifference, it was asserted, was an infliction of cruel and unusual punishment as to England for which his heirs should be entitled to recover damages.
The jury was instructed that "deliberate indifference exists if action is not taken in the face of a strong likelihood rather than a mere possibility that failure to provide care would result in harm to the prisoner." Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); Edwards v. Gilbert, 867 F.2d 1271, 1276 (11th Cir. 1989); Guglielmoni v. Alexander, 583 F.Supp. 821, 826 (D.C.Conn.1984).[2]
This Court now determines that the action or inaction of defendants was not of such consequence to show a deliberate indifference by defendants to England's suicidal behavior and the issue should not have been submitted to the jury. Certainly defendants' conduct did not give rise to an Eighth Amendment violation wherein their behavior constituted cruel and unusual punishment.
There is no suggestion by plaintiff that defendant violated England's constitutional right to be free from cruel and unusual punishment during his first incarceration from March 16, 1987 to the time of his parole on May 20, 1987. The evidence suggests that nothing of great moment occurred during this period. The claim of wrongdoing involves the events that took place during the period between June 18, 1987 when England was returned to jail because of parole violation and June 21, 1987 when he hanged himself.
When England entered the jail the second time, he was required to complete a medical history sheet.[3] He answered 44 medical questions such as history of bad vision, diabetes, blood in urine, etc. He scratched the "yes" box to the question "Have you ever attempted suicide?" All other questions, except one, were answered in the negative. England answered yes as the exception that he had "ankle swelling." He stated he was on no medication, did not use addictive drugs or narcotics, was not allergic to drugs and that he had no other known disease or sickness.
Sheriff Copeland and others had promulgated rules and procedures in an attempt to identify suicidal tendencies or latent defects or dangers in prisoners. Thus, when England stated in the medical history sheet of June 18, 1987 that he had attempted suicide, he was placed in a common area for observation.
*665 Other than the notation on the medical history sheet, there is no showing England had suicidal tendencies or defects which required more than normal prisoner monitoring. He made no oral statement about suicide or mental illness to defendants or jailers or other inmates. He did not act in any unusual manner nor did he do anything during both periods of incarceration that would suggest abnormal behavior.
Nonetheless, following the established procedures, after England completed the medical history sheet, he was examined by a clinical social worker from the Community Counseling Center on June 19, 1987, the day after his second jail admission and two days before he killed himself. The counselor felt England suffered from mild depression, but indicated no symptoms that were sufficient to suggest England was suicidal or needed mental health treatment. Accordingly, he made no recommendations for unusual care or attention.
In any event, England continued to be lodged in the jail common area for observation.
There is a booth in the central portion of the common area. The booth is constantly manned by a jailer and is enclosed but all portions of the common area can be seen by the jailer in the booth through a monitoring system. Prisoner cells are adjacent to the common area as is a shower room and bath. The monitoring equipment in the booth does not extend to the cells or the shower room. The jail will hold about 70 prisoners.
After midnight, the sheriff's personnel consists of the jailer in the booth, a radio dispatcher in the office area of the jail and at least one duty driver generally in a patrol vehicle. Additional personnel arrive at 7:00 a.m. each morning and are on duty until midnight. The jailer in the booth is directed never to leave the booth and in the event of emergency he calls the dispatcher in the facility for help. This procedure is designed for safety and to avoid escape or injury should a jailer leave the booth and possibly be overpowered by inmates.
Defendant Bedell came on duty at midnight on June 20, 1987 and assumed his post in the booth. At the time, England and another inmate were in the common area where Bedell continued to observe them. An hour or so later another prisoner was brought in by the duty officer on a driving-while-intoxicated charge. He, too, was placed in the common area. All other inmates were in cells with their doors locked.
Sometime after 3:00 a.m. while Bedell, in the booth, was processing the charge on the new prisoner, he observed England walk from the common area to the shower and bathroom. He did not return quickly and Bedell, while still in the booth, woke the second inmate in the common area and a trustee and sent them to the shower to check on England. The inmate and trustee went to the bathroom and returned quickly to state England had hung himself with a sheet in the bathroom area. The dispatcher was alerted and within ten or fifteen minutes, road personnel came in and confirmed the tragedy. Throughout the events, Bedell remained in the booth following jail procedures.
A followup investigation revealed that England had been assigned only one sheet for bedding in the common area. Nevertheless, he was able to obtain an additional sheet with which to hang himself. The collection of linens suggested no shortage so there was no definite evidence to suggest how England obtained the extra sheet. Bedell testified that as he observed England go to the bathroom, he could not see he carried a sheet or other bedding with him.
The history of the constitutional prohibition of "cruel and unusual punishment" is detailed in the case of Estelle v. Gamble, supra, and prior opinions. The basic concern of the drafters of the constitution was to prohibit torture and other barbarous methods of punishment.[4]
The Court in Estelle determined that the original intent should be broadened to meet *666 the demands of contemporary standards of decency. Thus, the court concluded "that deliberate indifference to serious medical needs of prisoners constitutes the `unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." Estelle v. Gamble, 429 U.S. at 104, 97 S.Ct. at 291.
Various courts have further broadened the Estelle decision in its application to prisoner suicides. Thus, if a jailer shows a deliberate indifference to a prisoner's obvious suicidal behavior, under certain circumstances it could be tantamount to an intent to punish. Danese v. Asman, 875 F.2d 1239, 1243 (6th Cir.1989).
Ordinarily, law enforcement officials are protected by a qualified immunity. "The relevant, fact-specific question in qualified immunity cases is whether any official could have, in light of the preexisting law, reasonably believed that his action was lawful." Danese v. Asman, supra at 1242, Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523 (1987) and Poe v. Haydon, 853 F.2d 418, 423 (6th Cir.1988).
When a defense of qualified immunity is raised it must be clearly established that a defendant's conduct in the circumstances amounted to deliberate indifference. Obviously, in the absence of a previous threat or an earlier attempt at suicide, official conduct in failing to prevent a suicide does not constitute deliberate indifference. Edwards v. Gilbert, 867 F.2d 1271 (11th Cir.1989). This is so even in an instance where a policeman, in violation of a prison regulation, did not remove a belt from a detainee who later hung himself with the belt. The court still determined the official was entitled to immunity. Gagne v. City of Galveston, 805 F.2d 558, 560 (5th Cir.1986), cert. denied, 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987).
In the case at bar, defendants were aware that England had attempted suicide. In such event, what is their duty? Must they monitor England, and if so, in what way?
In Snyder v. Baumecker, 708 F.Supp. 1451 (D.N.J.1989) an inmate became depressed, reduced his food intake, began urinating on the jail floor and was intermittently calm and hysterical. Officials segregated him and placed him on a 15-minute suicide watch. A psychiatrist diagnosed him as a severe alcoholic and his watch was extended to 30 minutes. In between one of the watches, he hung himself. The court dismissed the case on motion holding the officials did not act with callousness and indifference. The affirmative acts taken to protect decedent were sufficient to afford him Eighth Amendment rights.
In Danese v. Asman, supra, although a driving-while-intoxicated detainee threatened suicide and "wished he were dead," arresting officials placed him in a cell after removing his belt and shoes. Later, he told a jailer if a cigarette was not provided, he would hang himself with his shirt. A television monitor used to watch the prisoners was inoperative. The court decided that the officials were not required to screen the prisoners for the purpose of detecting suicidal tendencies even in light of this prisoner's behavior. Nor were the officials required under the circumstances here to place the decedent into suicide proof facilities.
Both Snyder and Danese suggest a case could be made if officials were adequately apprised of suicidal tendencies and did nothing. The line of authority suggests, however, that when reasonable steps are taken to guard against suicide, constitutional obligations are fulfilled. Even though the steps taken could constitute negligence, ordinarily this does not rise to the level of a constitutional violation.
The officials in the instant case had experience with England. He had been in jail over two months before he was released on parole. During that time, he did nothing to indicate abnormalcy or suicidal tendency. On his return, almost one month later, his normal conduct was unchanged. The only incident that could alert defendants to a possible problem was his single answer to *667 the medical questionnaire that he had attempted suicide.
When this was noted, defendants immediately instituted their policy of monitoring England. He was placed in the common area where he could be seen regularly. The next day, he was interviewed by a counselor who did not diagnose suicidal tendencies so he made no suggestion to defendants for any different care of England other than regular monitoring.
During this period England continued his normal posture. He did not discuss suicide with anyone nor did he exhibit any unusual characteristics. He did hang himself two days later in the bathroom area at about 3:00 a.m. when the prison population was asleep.
It appears to this Court that defendants have immunity as they did everything they could to protect England from himself. They did not disregard, ignore or abandon England. There were no facts to suggest defendants had an evil intent or motive to allow England to harm himself, nor were defendants callously indifferent to his needs. Rather, they took affirmative action to monitor him almost constantly.
The fact that monitoring equipment had not been installed in the bathroom does not suggest a callous disregard for England's needs. He was observed going to the bathroom at near 3:00 a.m. He had no sheet or bedding with him. This was certainly not abnormal behavior that would suggest any problem to the duty jailer. Defendants were not required under those circumstances to provide England with a suicide proof facility. Danese v. Asman, supra. The defendants were not the insurers of England's safety.
Certain evidence, not objected to, was adduced that within one year before England's death two jail inmates had hung themselves with a sheet and a third had attempted to do so. These incidents occurred at locations in the jail other than the bathroom area where England took his life. These facts do not alter the Court's finding and conclusions as to the case here.
This Court has empathy for those unfortunate, tormented souls who elect to take their lives and even more so for their families. Yet, one who is at liberty has license to do to himself as he chooses. He may live and abuse himself and malign his body and mind and even kill himself. It is innate in the spirit of most people that efforts should be taken to reason with those who threaten suicide in an attempt to prohibit their precipitous action. Frequently, this is impossible as self destruction continues in the face of heroic and heartfelt efforts to prevent it.
The desire to prevent one from taking his own life carries over to the judicial system which has determined, as suggested here, that prisoners, who are detained and who have lost much of their liberty, still must be protected from themselves. This is so, for humane reasons, even though the prisoner, if he had his liberty, could take his life at his own election and without governmental interference.
Yet, the judicial determination must be limited. Hundreds of thousands of prisoners pass through penal institutions each day. Thus, we require reasonable, not heroic protection to those persons from themselves if they exhibit suicidal characteristics.
This reasonable effort to protect might involve a variety of actions. One could be isolation, another interval monitoring, still another more frequent monitoring. The effort does not require the authorities under the facts of this case 24-hour monitoring, although it was virtually undertaken here by policy. It does not require the authorities to follow and lead the inmate, as if he were on a leash. It does not require guarded presence at all times ever ready to offer protection. It does not require a suicide proof facility.
England received an abundance of constitutional protection. This Court now concludes as a matter of law that reasonable steps were taken in this case to prevent England from taking his life and defendants are thereby entitled to immunity.
IT IS THEREFORE ORDERED that judgment is entered in favor of defendants *668 Copeland and Bedell notwithstanding the verdict against them.
IT IS ALSO ORDERED that defendants' motion for a new trial and plaintiff's request for attorneys' fees is DENIED as moot.
NOTES
[1] England's parents were not named as plaintiffs even though, under Missouri law, they might be entitled to share in whatever damages ultimately could be assessed as a result of their son's death.
[2] England had been convicted of a crime and sentenced to one year in jail so the standard of care accorded a pretrial detainee was not in issue. Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).
[3] Apparently, he was not required to complete such a history on the date of his first incarceration on March 16, 1987.
[4] Undoubtedly, the search, seizure, imprisonment and torture of many of the signers of the Declaration of Independence, their spouses and family members was still fresh in their minds.