**Guy ELLIOTT, Sr., as Voluntary Administrator of the Estate of Guy C. Elliott, Jr.**

v.

**CHESHIRE COUNTY, NEW HAMPSHIRE, Patrick McManus, Cheshire County House of Corrections, Superintendent, Individually and in His Official Capacity, Carl Baird, Cheshire County House of Corrections, Corrections Supervisor, Individually and in His Official Capacity, Angie Malloy, Cheshire County House of Corrections, Corrections Officer, Individually and in**

Her Official Capacity, Robert Norton, Cheshire County House of Corrections, Corrections Officer, Individually and in His Official Capacity, Arthur Whipple, Cheshire County House of Corrections, Corrections Officer, Individually and in His Official Capacity, Richard Clapp, Cheshire County House of Corrections, Corrections Officer, Individually and in His Official Capacity, John Thornton, Cheshire County House of Corrections, Corrections Officer, Individually and in His Official Capacity, M.P. Ranhoff, New Hampshire State Police, Trooper, Individually and in His Official Capacity.

Civ. No. 89–412–D.

United States District Court,
D. New Hampshire.

Nov. 9, 1990.

Bragdon & Berkson, P.C. by James Romeyn Davis and Katharine Lord Klein, Keene, N.H., for plaintiff.

Cleveland, Waters & Bass by Craig L. Staples, Concord, N.H., for defendants.

State Atty. General's Office by Charles T. Putnam, Civ. Bureau, Concord, N.H., for M.P. Ranhoff.

## ORDER

DEVINE, Chief Judge.

Plaintiff Guy Elliott, Sr., brings this civil action alleging that defendants deprived his son, Guy Elliott, Jr. ("Guy"), of his constitutional rights in violation of 42 U.S.C. § 1983. Plaintiff alleges that defendants are responsible for Guy's suicide while a pretrial detainee in the Cheshire County House of Corrections. Jurisdiction is based on 28 U.S.C. § 1343(a). Before the Court are defendants' motions for summary judgment.

### Background

On February 22, 1988, at the home of his parents in Marlow, New Hampshire, Guy C. Elliott, Jr. ("Guy"), age 18, assaulted his mother during an argument. When his brother and father attempted to intervene, Guy fought with and threatened them. The police were summoned, but Guy left the scene before they arrived. Trooper Michael Ranhoff of the New Hampshire State Police arrived at the Elliott home at about 2:00 p.m. While Mr. Elliott conducted a search for Guy, Mrs. Elliott related the incident to Trooper Ranhoff, adding that they had had trouble with Guy in the past.

Mrs. Elliott explained to Trooper Ranhoff that Guy had been previously involved with the juvenile justice system because of an assault on his father. Trooper Ranhoff was apparently aware that there had been previous problems with Guy. Mrs. Elliott said that after his previous arrest Guy was evaluated and spent time at several mental health facilities and had been diagnosed as a schizophrenic. Mrs. Elliott did not tell Trooper Ranhoff that Guy had twice threatened suicide during this time. Because the juvenile justice system limited the trial testimony to the single event of the assault on his father, Guy was merely told to go home and try to get along better with his parents. Mrs. Elliott said that Guy had been to see a psychiatrist, Dr. Hollenbeck,[1] at Monadnock Family Services, who had also diagnosed Guy as schizophrenic. Guy's behavior continued to worsen. He spent most of his time in his room alone, rarely dressed, and did not come to meals.

Guy's father, unable to locate his son, returned and spoke with Trooper Ranhoff. Mr. Elliott indicated he would not fill out a complaint for the assault because their experience with the juvenile justice system had not been helpful. Trooper Ranhoff told them that since Guy was now an adult things would be different, as all of the medical information would be available to the court and would enable the system to help Guy. The Elliotts then made out the complaint.

---

[1]. Dr. Hollenbeck is actually a psychologist; his field was misstated by Mrs. Elliott at the time of her conversation with Trooper Ranhoff. Deposition of Mrs. Rebecca Ann Elliott at 51–52.

Trooper Ranhoff and Mr. Elliott conducted a brief search for Guy, but to no avail, and Trooper Ranhoff left the Elliott home. Guy returned while the family was having dinner, and calmly went to his room. Mr. Elliott called the police, and Troopers Ranhoff and Jebson arrived and arrested Guy. Guy was calm and polite during the arrest and quiet during the trip to the jail.

At about 5:30 Guy arrived at the Cheshire County House of Corrections ("CCHOC") and was booked. Defendant Angie Malloy, a corrections officer, did the intake. Trooper Ranhoff told corrections officer Robert Norton that Guy had assaulted his family, but did not tell anyone about Guy's previous offense or his mental illness. The intake form did not include questions about mental health, and it was not customary for the intake and receiving officers to seek information regarding detainees from the arresting officer.

Guy was placed in an observation cell overnight and was arraigned the following morning. Bail was reduced from $5,000 to $1,000, but Guy was committed to CCHOC with a scheduled hearing on March 1. After the arraignment, Trooper Ranhoff called Mrs. Elliott to tell her that a caseworker had seen Guy and concluded that he was hostile toward his family. The Elliotts decided not to post bail, and Guy remained in jail pending the hearing.

On February 26, several days after the incident, Mrs. Elliott spoke with Dr. Hollenbeck. She apprised him of the situation, and he called CCHOC to inquire about Guy. Someone at the jail told the doctor that Guy was fine. Dr. Hollenbeck also spoke with Guy's attorney and told her that Guy should receive inpatient psychiatric treatment rather than incarceration. Guy's attorney told Dr. Hollenbeck that she would ask the court to appoint a guardian for Guy at the hearing. Dr. Hollenbeck related this conversation to Mrs. Elliott and told her that Guy would probably go to the Concord mental hospital. Mrs. Elliott in turn spoke with Trooper Ranhoff on February 28 and told him what the doctor had said. Trooper Ranhoff responded that he would call Guy's attorney the following day.

During his time as a pretrial detainee, Guy Elliott was reported by CCHOC officials to be a "nonproblematic prisoner." However, several incidents took place which plaintiff alleges should have indicated to the staff that there was something seriously wrong with Guy's mental health.

Two of Guy's fellow inmates reported that Guy was very troubled by the fact that he was not permitted to call his family. Exhibits E and F, Affidavits of Timothy Deem and Glen Hall, to Memorandum of Law in Objection to Motions for Summary Judgment. One of them stated that he did not understand what was meant when the inmates were asked if they wanted to take a shower. Deem Affidavit at 2. Guy also asked them several strange questions— whether the water was safe to drink and what would happen if he stuffed paper towels or a bar of soap down his throat. Deem Affidavit at 2; Hall Affidavit at 2. Inmate Hall stated he heard Guy say he wanted to drown himself in the toilet. Hall Affidavit at 2. Both inmates reported these comments to the guards. *Id.* When confronted, Guy was assured the water was safe to drink, despite what other inmates had told him. Submission in Support of Defendants' Motion for Summary Judgment, Vol. 1, Deposition of Angelica Malloy at 90–93. On February 28, the inmates saw Guy banging his head against the bars of his cell and trying to stuff his head under a shelf. This was reported to defendant Malloy, who asked Guy what he was doing. Guy responded that he was just "kidding around". *Id.* at 97–99. Officer Malloy stated she had no reason to believe that Guy was in any danger. *Id.* at 99. When Officer Whipple took over the shift a short time later, Officer Malloy told him about Guy's behavior, and the two made a bed check of Guy, who appeared to be fine. *Id.* at 106–07. Subsequent checks on the inmates at approximately 12:55, 1:45, 2:55, and 3:40 a.m. on February 29 indicated that all was "quiet and secure." Submission in Support of Motion for Summary Judgment, Vol. II, Exhibit H, Daily Logs.

At about 4:40 a.m. on Monday, February 29, Guy was found hanging in his cell from

a noose made of bed sheets tied to a sprinkler head. The Elliotts were informed of his death at about 9:30 that morning.

The thrust of plaintiff's section 1983 claim is that the individual defendants failed to provide necessary medical and psychiatric services, failed to implement safeguards to prevent injury, failed to properly observe and supervise decedent, and failed to assess Guy's suicidal tendencies. Complaint at ¶¶ 41–45, 63. All named defendants are sued in their individual and official capacities.[2] Plaintiff also alleges that the county insufficiently staffed the jail, failed to properly train officers, and improperly designed, maintained, and constructed the jail. Complaint at ¶¶ 52, 56. Defendants move for summary judgment, asserting qualified immunity, and argue that neither the actions of the defendants nor the policies, actions, or alleged omissions of the county constitute wanton callousness or deliberate indifference to Guy's Fourteenth Amendment rights.

*1. Qualified Immunity*

■ The doctrine of qualified immunity protects government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory and constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). "The contours of the right 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Fonte v. Collins*, 898 F.2d 284, 295 (1st Cir.1990) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987)).

The right in question, however, cannot be simply a generalized right, like the right to due process. *Anderson*, [483 U.S. at 639, 107 S.Ct. at 3038–39]. It must be clearly established in a "particularized" sense.... This particularity require-

ment does not mean that the very action in question has been held unlawful; it does mean, though, that in the light of the preexisting law the illegality of the action must be apparent. *Ibid.*

*Danese v. Asman*, 875 F.2d 1239, 1242 (6th Cir.1989), *cert. denied*, — U.S. ——, 110 S.Ct. 1473, 108 L.Ed.2d 610 (1990).

■ The relevant question therefore is whether a reasonable official could have believed the actions taken by the defendants to be lawful in light of clearly established law and the information available to the defendants. *Anderson, supra,* 483 U.S. at 641, 107 S.Ct. at 3039–40. The subjective beliefs of the actual defendants are irrelevant. *Id.* Even "[a]n allegation of malice is not sufficient to defeat immunity if the defendant acted in an objectively reasonable manner." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986).

For the purposes of summary judgment, this court "must examine the discovered facts regarding defendants' conduct relevant to the immunity claim and applying normal summary judgment principles, determine whether a genuine issue does or does not exist concerning qualified immunity." *Fonte, supra,* 898 F.2d at 285 (citing *Unwin v. Campbell*, 863 F.2d 124, 132 (1st Cir.1988)). If it was reasonable, given the facts in the light most favorable to the plaintiff, for Trooper Ranhoff and the named prison officials to believe that their conduct did not violate Guy Elliott's constitutional rights, they are entitled to qualified immunity.

a. The Deliberate Indifference Standard

■ In *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), the Supreme Court held that "deliberate indifference to serious medical needs of prisoners" violates the Eighth Amendment right of a prisoner to be free from cruel and unusual punishment. Under the Fourteenth Amendment, the due process rights of a pretrial detainee are at least as great

---

**2.** To the extent plaintiff's section 1983 action sues defendant Ranhoff in his official capacity, *Will v. Michigan Dept. of State Police,* 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), bars such claim.

as those rights the Eighth Amendment affords a convicted prisoner. *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Accordingly, courts have held that the deliberate indifference standard applies to the rights of pretrial detainees. *See Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983); *Redman v. County of San Diego*, 896 F.2d 362, 365 (9th Cir.1990); *Danese v. Asman, supra; Roberts v. City of Troy*, 773 F.2d 720, 722 (6th Cir.1985); *Partridge v. Two Unknown Police Officers*, 791 F.2d 1182, 1186 (5th Cir.1986); *Whisenant v. Yuam*, 739 F.2d 160, 163 (4th Cir.1984); *Lightbody v. Town of Hampton*, 618 F.Supp. 6, 11 (D.N.H.1984). Plaintiff alleges that Trooper Ranhoff was deliberately indifferent to Guy's medical needs by failing to advise CCHOC officials of Guy's mental health history. Plaintiff further alleges that the individual CCHOC officials were deliberately indifferent by failing to assess Guy's mental condition and prevent his suicide.

In this circuit, it has been stated that "[i]n the lexicon of qualified immunity, there is room for mistaken judgments." *Brennan v. Hendrigan*, 888 F.2d 189, 192 (1st Cir.1989). However, "when a supervisory official is placed on actual notice of a prisoner's need for physical protection or medical care, 'administrative negligence can rise to the level of deliberate indifference to or reckless disregard for that prisoner's safety.'" *Layne v. Vinzant*, 657 F.2d 468, 471 (1st Cir.1981) (quoting *West v. Rowe*, 448 F.Supp. 58, 60 (N.D.Ill.1978)).

In *Cortes–Quinones v. Jimenez–Nettleship*, 842 F.2d 556 (1st Cir.), *cert. denied*, 488 U.S. 823, 109 S.Ct. 68, 102 L.Ed.2d 45 (1988), the court denied qualified immunity to officials because they were found to be deliberately indifferent to plaintiff's safety and health. In that case, the decedent was under the treatment of a prison psychologist who had diagnosed him as psychopathic and possibly schizophrenic. There was also a federal court decree which had found the entire Puerto Rican prison system unconstitutionally unsafe and medically deficient, and the district court had ordered that mentally ill inmates be segregated.

The decedent was killed by other prisoners when he was transferred from one facility to another and not segregated as required by the court order. Under these extremely volatile circumstances, the First Circuit ruled that the officials ought to have been "increasingly sensitive to the need to avoid those acts or omissions, within their control, that might make matters worse." *Id.* at 562. The court found that deliberate indifference "encompasses acts or omissions so dangerous (in respect to health or safety) that a defendant's 'knowledge of [a large] risk can be inferred.'" *Id.* at 558 (quoting *Duckworth v. Franzen*, 780 F.2d 645, 652 (7th Cir.1985)). Here, the facts are clearly distinguishable. There may well have been mistaken judgments regarding the nature of Guy's behavior, but there is no evidence that defendants were given actual notice of Guy's need for special care or protection or that their failure to act placed Guy in any serious danger.

In prison suicide cases, a handful of courts have attempted to reconcile the deliberate indifference standard with the qualified immunity defense. In *Gagne v. City of Galveston*, 805 F.2d 558 (5th Cir. 1986), *cert. denied*, 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987), decedent was arrested for public intoxication. There was a policy to remove prisoners' belts, but the booking officer did not do so, and the prisoner hanged himself that night from his belt. The court found that, despite his violation of the departmental rule about removing belts, the officer was entitled to qualified immunity because the sole issue was whether the officer had deprived the decedent of a clearly established constitutional right. *Id.* at 560. Finding that no constitutional duty to protect prisoners from self-destructive behavior was clearly established at the time Gagne was arrested, the court dismissed the claim against the officer. Since that time, similar cases continue to arise, and the precise nature of the constitutional right in a prison suicide case is still not clearly established.

In *Edwards v. Gilbert*, 867 F.2d 1271 (11th Cir.1989), a juvenile tried as an adult hanged himself with a bed sheet while

awaiting sentencing. The court stated that in the case of a section 1983 claim for a prisoner suicide case, the plaintiff must not only show that officials were deliberately indifferent to the possibility of the suicide, but that "once the defense of qualified immunity is raised, the plaintiff must persuade the court that the law was clearly established that the defendant's conduct in the circumstances amounted to "deliberate indifference". *Id.* at 1274–75.

In the absence of a previous threat of or an earlier attempt at suicide, we know of no federal court in the nation or any other court within this circuit that has concluded that official conduct in failing to prevent a suicide constitutes deliberate indifference. *See e.g., Cabrales v. County of Los Angeles,* 864 F.2d 1454 (9th Cir.1988) (denying defendants' motion for JNOV where jailers had rescued decedent from previous suicide attempt); *Partridge v. Two Unknown Police Officers,* 751 F.2d 1448 (5th Cir.1985), *withdrawn,* 755 F.2d 1126 (5th Cir.1985), *substituted opinion,* 791 F.2d 1182 (5th Cir. 1986) (plaintiff stated a valid claim where it was known that detainee-decedent had attempted suicide in previous confinement); *Guglielmoni v. Alexander,* 583 F.Supp. 821 (D.Conn.1984) (defendants' motion for summary judgment denied where inmate-decedent had "faked" suicide by hanging then actually hung himself a month later); *Matje v. Leis,* 571 F.Supp. 918 (S.D.Ohio 1983) (defendants' motion for summary judgment denied where inmate-decedent told counsel who told jail officials that inmate would attempt suicide if sent to jail by smuggling in drugs behind her diaphragm and body cavity search was not performed at jail); *Francis v. Pike County,* 708 F.Supp. 170 (S.D.Ohio 1988) (summary judgment in favor of defendants appropriate, where police officer failed to remove detainee's belt and detainee used belt to hang himself, because there was no evidence that officer or any other employee of sheriff's department knew or should have known that detainee was suicidal); *Hutchinson v. Miller,* Case No. 86–6005–CA–T (Fla. 18th Cir.Ct. Sept. 15, 1988) (jailers entitled to summary judgment because of absence of evidence that jailers had knowledge of suicidal tendencies, where juvenile inmate asked to remain in doors while his cell mates went out for exercise and hung himself while left alone for an hour).

*Id.* at 1275 (footnote omitted). In *Edwards,* there was no mention of suicidal tendencies or evidence of unusual behavior, and therefore defendants were entitled to qualified immunity in their individual capacities.

In *Rellergert v. Cape Girardeau County, Mo.,* 724 F.Supp. 662, 666 (E.D.Mo. 1989), the court applied the rule set in *Edwards.* In that case, defendants were aware that the inmate had previously attempted suicide, yet they still received immunity because they acted reasonably under the circumstances (he was regularly monitored) to prevent his death. The fact that other inmates had hanged themselves in the past was found to be irrelevant. The court further found that, while prisoners who exhibit suicidal characteristics must be reasonably protected from themselves for humane reasons, a "suicide-proof facility" is not constitutionally required. *See Rellergert, supra,* 724 F.Supp. at 667.

In *Danese v. Asman, supra,* 875 F.2d 1239, when a detainee was brought in intoxicated, he repeatedly said he wished he were dead, and he cried. He also told another inmate that the reason officials take shoelaces from inmates is to prevent them from committing suicide. Later he threatened a guard that he would hang himself if he couldn't have a cigarette. The district court found clearly established Fourteenth Amendment rights in the pretrial detainee's right not to be punished by way of denial of medical care and his right not to be deprived of his liberty interest in personal security. The Sixth Circuit Court of Appeals, however, stated that

the rights the district court cites as having been clearly established were not particularized rights as required by *Anderson* and, thus, were not sufficient to deny the defendants qualified immunity. The "right" that is truly at issue

here is the right of a detainee to be screened correctly for suicidal tendencies and the right to have steps taken that would have prevented suicide. The general right to medical care, for example, is not sufficient to require a police officer to have known that he had to determine that Danese was seriously contemplating suicide and stop him from following through.

*Id.* at 1243–44.

The *Danese* court goes on to note the difference between ignoring those who are seriously in need of medical help and asking for it, and failing to properly screen prisoners to discover if they need help. *Id.* at 1244. It found that the right to medical care established in cases like *Estelle* "would not give reasonable officers notice that their actions in this case were illegal." *Id.* *Danese* held, and this Court agrees, that if the officials had been certain that an inmate would attempt suicide and chose to ignore it, or if an inmate asked for psychological help, qualified immunity might not be warranted. However, in this case, the officers could have reasonably thought

> that they were acting legally when they treated Danese as they would any prisoner. Without precedent establishing an unambiguous right to have the police diagnose one's condition as prone to suicide, these officers cannot be held liable for not taking extraordinary measures to restrain Danese.

*Id.* Likewise, in the case at bar, neither Ranhoff nor the jail officials should be held liable for failing to diagnose Guy's mental condition as potentially suicidal or to prevent his suicide.

b. Qualified Immunity of Trooper Ranhoff

■ Ranhoff did know something of Guy's history, and did know that the Elliotts hoped a trial would bring help for

Guy, but that is all he knew. He did not know that Guy had suicidal tendencies, and he never witnessed any violent behavior by Guy. That a clearly established right to medical treatment existed is not grounds for putting a reasonable officer on notice that a calm arrestee, albeit one with a history of mental disturbance, was in need of immediate treatment to prevent a suicide. Far from there being a constitutional right of an arrestee to have his arresting officer inform jail officials of his medical or mental history, there was no state statute or policy that required such reporting. Defendant Ranhoff is therefore entitled to qualified immunity.[3]

c. Qualified Immunity of CCHOC Defendants

A reasonable official in possession of the information available to the CCHOC defendants could not have known that he was violating Guy's rights. When Guy was brought to CCHOC, he went through the normal intake procedure and was placed in an observation cell overnight. Nothing in the record indicates that Guy told anyone he wanted or needed medical or psychiatric attention or that he displayed bizarre behavior while under observation. At no time did the Elliotts or anyone else advise the correction officials to be particularly watchful of Guy. That Dr. Hollenbeck called the prison to ask about Guy does not, standing alone, put defendants on notice about Guy's mental stability or his propensity to commit suicide.[4] During the next week, Guy did ask several strange questions and bang his head against the bars of his cell. When informed of this behavior, the guards checked on Guy and asked him about his behavior, but were told by him that he was just "kidding around". They were reasonable in accepting Guy's explanation. Guy did not tell the guards he wanted to kill himself, nor did he ask for

---

**3.** Even if Trooper Ranhoff did make the callous remark, "I see you tried and convicted Elliott," *see* Deposition of Angie Malloy at 123, regarding Guy's death, this would not alter the qualified immunity analysis. This statement, made after the incident, is irrelevant here, however distasteful it may be.

**4.** Indeed, plaintiff himself characterized defendants' knowledge that Guy was being treated by Dr. Hollenbeck as at best based on "circumstantial evidence." Plaintiff's Memorandum of Law in Support of Objection to Motion for Summary Judgment at 35.

any kind of medical treatment. Therefore, the corrections officials' inaction did not amount to deliberate indifference, and they too are entitled to qualified immunity.

### 2. Municipal Liability under Section 1983

Remaining are plaintiff's claims against Cheshire County alleging that the county had a custom or policy that caused officers to be deliberately indifferent to the need to assess suicidal tendencies. Plaintiff alleges two sources of municipal custom as a basis for liability. First, plaintiff argues that the County's failure to develop adequate training methods and procedures for screening potentially suicidal detainees constituted conscious disregard and deliberate indifference to a detainee's constitutional rights. Second, he argues that the construction, design, and maintenance of the county jail are so inadequate that the inadequacies directly and proximately allowed Guy to kill himself.

 Municipal liability under 42 U.S.C. § 1983 can be found only "where the municipality itself causes the constitutional violation at issue. *Respondeat superior* or vicarious liability will not attach under § 1983." *City of Canton, Ohio v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 1203 (1989); *Santiago v. Fenton,* 891 F.2d 373, 381 (1st Cir.1989). Therefore, a plaintiff must show that a policy or custom led to the constitutional deprivation alleged. *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). This requires that a plaintiff demonstrate both the existence of a policy or custom and a causal link between that policy and the constitutional harm. *See City of Canton, supra,* 109 S.Ct. at 1203; *Oklahoma City v. Tuttle,* 471 U.S. 808, 823, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985); *Santiago, supra,* 891 F.2d at 381. *See also City of Springfield, Mass. v. Kibbe,* 480 U.S. 257, 267, 107 S.Ct. 1114, 1119–20, 94 L.Ed.2d 293 (1986) (O'Conner, J., dissenting) (municipal policy must be "moving force" behind constitutional deprivation); *Polk County v. Dodson,* 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981).

#### a. Municipal Liability Based on Inadequate Training of Prison Officials

 The Court first turns to the claim of a policy of inadequate training. In *City of Canton,* the Supreme Court held that a municipality may be held liable for a failure to train only when that failure "evidences a 'deliberate indifference' to the rights of the inhabitants.... Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by our prior cases—can a city be liable for such a failure under § 1983." 109 S.Ct. at 1205 (quoting *Oklahoma v. Tuttle,* 471 U.S. 808, 823, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985)).

Since *City of Canton,* the First Circuit has had several opportunities to address the issue of whether the evidence offered is sufficient to meet the deliberate indifference standard. *See, e.g., Burns v. Loranger,* 907 F.2d 233, 239 (1st Cir.1990) (no evidence found of any deficient city policy regarding strip searching); *Santiago, supra,* 891 F.2d at 381–82 ("weaknesses" in police training do not amount to a "policy of failure to train arising from deliberate indifference to citizens' constitutional rights"); *Bordanaro v. McLeod,* 871 F.2d 1151, 1156 (1st Cir.) (city custom or practice must be shown to have been "so well-settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it, yet did nothing to end the practice"), *cert. denied,* —— U.S. ——, 110 S.Ct. 75, 107 L.Ed.2d 42 (1989).

Here, plaintiff attempts to meet the deliberate indifference standard by offering three types of evidence. First, he points to the history of suicide incidents at CCHOC. In the ten years before Guy's suicide, there were two other suicides (in 1979 and 1983) and several attempted suicides. The inference plaintiff draws therefrom is that the county was on notice of this danger in its jail and was therefore obligated to train its officers in assessing prisoners and pretrial detainees who are known suicide risks. While the county was certainly on notice of the danger of prison suicides, there is no

indication that there was a longstanding, widespread pattern of ignoring the problem. *See City of Canton, supra,* 109 S.Ct. at 1209 (O'Conner, J., concurring in part and dissenting in part); *Bordanaro, supra,* 871 F.2d at 1156. Indeed, the county presents uncontroverted evidence that over the past ten years they have had in place procedures and mental health professional services for dealing with known suicide risk inmates. Therefore, the history of suicide incidents at CCHOC does not support a claim of deliberate indifference, but rather begs the ultimate question of whether such training was adequate. Second, based on the depositions of two CCHOC officers, plaintiff contends that the prison suicide prevention training which was offered was "illusory" in several ways: (a) not every officer received a copy of the practice and procedure manual; (b) there was no testing or retesting to assure that each officer understood the manual; and (c) the training at CCHOC, course work at the New Hampshire Association of Counties, and the limited sessions officers had with Monadnock Family Services counselors were "superficial and cursory". Third, plaintiff presents the report of Joseph R. Rowan, Executive Director of Juvenile and Criminal Justice International, Inc., a nonprofit consulting company which renders opinions in the field of corrections, as proof that the mental health screening and monitoring of inmates at issue here are inferior by the standards of the profession. This offered evidence is insufficient to create a triable issue of fact as to whether Cheshire County had a policy of inadequately training its correctional officers to handle situations like the one involved here. The conduct of the defendant officers has already been found to be objectively reasonable. *See* discussion *supra.* Thus, there can be no causal connection between any deficient county policy relating to the prevention of prison suicides and the alleged deprivation of the decedent's Eighth and Fourteenth Amendment rights. *Burns v. Loranger, supra,* 907 F.2d at 239.

Furthermore, failure to provide better suicide prevention training or the need for closer adherence to national standards on suicide prevention will not, without more, amount to deliberate indifference. *See City of Canton, supra,* 109 S.Ct. at 1206; *Santiago, supra,* 891 F.2d at 392; *Buffington v. Baltimore County,* 913 F.2d 113 (4th Cir.1990). The key question was framed by the Supreme Court in *City of Canton:* "Would the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect?" *Id.*

In this case, plaintiff fails to show how better training in suicide prevention would have alerted the guards to the presence of a suicide risk and the need to take precautions beyond those actually taken. Guy's docile behavior during the intake process, his explanation for his strange behavior when confronted by the guards, and the fact that subsequent bed checks indicated that Guy was quiet and safe hardly add up to a noteworthy indication of a suicide risk. In light of these circumstances, the Court finds that better-trained guards, unfortunately, would not have prevented Guy from taking his own life. As one court has eloquently stated,

It is one thing to require a municipality to train its police officers to recognize and not ignore obvious medical needs of detainees with known, demonstrable, and serious mental disorders. It is quite another to require as a constitutional minimum that a municipality train its officers to medically screen each pretrial detainee so that the officers will unerringly detect suicidal tendencies. The latter requires the skills of an experienced medical professional with psychiatric training, an ability beyond that required of the average police officer by the due process clause.

*Burns v. City of Galveston,* 905 F.2d 100, 104 (5th Cir.1990) (pretrial detainee's right to adequate medical care does not include an absolute right to psychological screening). Therefore, plaintiff's factual allegations fail to reach the high standard of deliberate indifference set out by the Supreme Court for a finding of liability for inadequate training of corrections officers.

### b. Municipal Liability Based on Inadequate Prison Facilities

 Plaintiff also argues that Guy's suicide was directly and proximately caused by the inadequate construction, design, and maintenance of the county jail. Specifically, they contend that the sprinkler head should have had a protective covering; the bed sheets should have been the rip-away variety; the audio monitoring system should have been in the "sensitive mode", and continuous video monitors should have been installed for each cell.

Plaintiff seems to suggest that the county's failure to build a suicide-proof jail cell amounts to deliberate indifference to the safety of inmates and detainees. The problem with this theory is that such inadequacies have not been shown to be the result of any municipal policy. That is, plaintiff fails to show that the county made "a deliberate choice to follow a course of action made from among various alternatives by the official or officials responsible for establishing formal policy with respect to the subject matter in question." *Pembaur v. Cincinnati*, 475 U.S. 469, 483–84, 106 S.Ct. 1292, 1300, 89 L.Ed.2d 452 (1986). Moreover, no court has yet been willing to hold a municipality liable on such a theory. *See Molton v. City of Cleveland*, 839 F.2d 240, 246 (6th Cir.), *cert. denied*, 489 U.S. 1068, 109 S.Ct. 1345, 103 L.Ed.2d 814 (1990). Accordingly, this Court rejects plaintiff's section 1983 claims against Cheshire County.

### 3. State Claims

In Counts VII, VIII, XI, and XIII of the complaint, plaintiff also alleges several state claims sounding in negligence. Having dispensed with the federal claims in this action, in accordance with general federal jurisprudential practice, the Court herewith dismisses the pendent state law causes of action without prejudice. *See United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1986); *Massachusetts Universalist Convention v. Hildreth & Rogers Co.*, 183 F.2d 497 (1st Cir.1950); *Thompson*

*v. Sanborn*, 568 F.Supp. 385, 391 (D.N.H. 1983).

### Conclusion

For the reasons stated herein, the motions for summary judgment (documents no. 14 and 16) are granted. Each party is to bear its own attorney's fees and costs.

SO ORDERED.